Peter B. Schyman, Appellant, v. Department of Registration and Education of State of Illinois, Administrative Agency, and C. Hobart Engle, et al., Appellees.

Gen. No. 46,640.

First District, Second Division.
April 3, 1956.
Rehearing denied April 24, 1956.
Released for publication April 24, 1956.

505

506

Albert W. Dilling, Kirkpatrick W. Dilling, and G. Wallace Roth, all of Chicago, for appellant.

Latham Castle, Attorney General of State of Illinois, of Chicago, for appellees; William C. Wines, Raymond S. Sarnow, A. Zola Groves, and Robert E. Cleveland, Assistant Attorneys General, all of Chicago, of counsel.

JUDGE ROBSON delivered the opinion of the court.

This is an appeal from an order of the trial court affirming the final administrative decision of the defendant Department of Registration and Education revoking plaintiff Peter B. Schyman's license to practice medicine. The appeal was originally filed in the Supreme Court and transferred by it to this court.

Plaintiff's contentions pertaining to due process of law as guaranteed to him by Sec. 2, Art. II of the Constitution of the State of Illinois and Amendment XIV to the Constitution of the United States, cannot be passed upon by us. We must assume that the Supreme Court in transferring the case to this court decided that these issues were not material to the ultimate decision of the appeal.

The principal grounds plaintiff alleges for reversal of the order of the trial court which are properly before us are that (1) the complaint filed against plaintiff was void because of the failure to mention specifically the place where the offense charged against plaintiff was committed; (2) the evidence adduced at the hearings did not support the findings of the administrative agency; (3) certain evidence introduced involving persons and criminal charges that were not connected with or related to plaintiff or the issues at bar, constituted such error as to render the proceedings void and of no

507

effect; and (4) the delegation to the Medical Examining Committee to pass upon purely legal questions constitutes an illegal subdelegation of power.

The complaint was in the nature of an information filed by one Marjorie Taylor who presented herself to the plaintiff for treatment of diabetes. It was amended, and as one of the principal grounds for reversal is the inadequacy of this complaint, we here quote the charges therein:

"2. That said Peter B. Schyman, on or about the 16th day of December, A.D., 1949, has held himself out as a specialist in the treatment of many human diseases and particularly diabetes, claiming to use a method for treating said disease and using a certain medicine that will aid in the treatment and cure for said disease of diabetes. The said Peter B. Schyman so holds himself out and makes such claims knowing that such claim and representation is false and of no value; that such claim as to the efficacy of said medicine and treatment is entirely contrary to all regular methods of treatment employed by members of his profession and school of training who are specialists in the treatment of diabetes;

"3. That said Peter B. Schyman, on or about the 16th day of December, A.D., 1949, recommended and prescribed to your relator, a certain liquid medicine that the said Peter B. Schyman uses in treating and curing diabetes and led relator to believe that said liquid medicine was compounded of substances of great medical value; that the said Peter B. Schyman well knew such representations were grossly inaccurate and untrue; that the said Peter B. Schyman well knew that the formula for said medicine was developed by one Charles F. Kaadt and one Peter S. Kaadt of South Whitley, Indiana, and doing business as the Kaadt Diabetic Clinic at South Whitley, Indiana; that the said Peter B. Schyman well knew that on May 4, 1948, in the U. S. District Court, Northern District of Indiana

508

at Fort Wayne, Indiana, the said Peter S. Kaadt and Charles F. Kaadt were convicted and sentenced on the charge of shipping interstate drugs falsely claimed to cure diabetes.

"4. Relator further states that the said Peter B. Schyman, after recommending and prescribing said medicine as stated in paragraph three (3) gave relator a one gallon jug of said medicine and received from relator the sum of thirty ($30.00) dollars; that the said Peter B. Schyman gave relator full written instructions for taking said medicine."

The complaint is informal. It does not mention specifically the place where the offense charged against the plaintiff was committed and plaintiff contends that it is the law of this state that not only the time but also the place of the alleged offense must be stated in the complaint or other documents setting forth the charges. Section 60(c) of the statute governs the procedure to be taken by the Department of Registration and Education of the State of Illinois (Ill. Rev. Stat. 1953, ch. 127, secs. 58–63) in revoking a license. The pertinent part pertaining to this issue is as follows:

"Certificates may be revoked or suspended in the manner provided by this Act and not otherwise. The Department may upon its own motion and shall upon the verified complaint in writing of any person, provided such complaint or such complaint together with evidence, documentary or otherwise, presented in connection therewith shall make a prima facie case, investigate the actions of any person holding or claiming to hold a certificate. Before suspending or revoking any certificate, the Department shall issue a citation notifying the registrant of the time and place when and where a hearing of the charges shall be had. Such citation shall contain a statement of the charges or shall be accompanied by a copy of the written complaint if such complaint shall have been filed. . . ."

An examination of this section does not indicate that the allegation of the place where the offense occurred is a substantive requirement. It is the law that charges filed before an administrative agency need not be drawn with the same nice refinements and subtleties as pleadings in a court of record. Joyce v. City of Chicago, 216 Ill. 466; Davis v. Board of Registration of Medicine, 251 Mass. 283. The defendant, however, must be reasonably apprised by the complaint of the case against him so that he will be able to intelligently prepare his defense. Smith v. Department of Registration and Education, 412 Ill. 332. Plaintiff, however, contends that the construction of the Act should be highly technical and we should require set specifications for every case regardless of the particular situation. As authority for this he cites Kalman v. Walsh, 355 Ill. 341, which involved the revocation of a dentist's license. The court said, p. 346:

"While it is not necessary that charges of professional misconduct, proof of which would justify the suspension or revocation of the license of the practitioner, should be drawn with the same accuracy and certainty as an indictment or information in a criminal case, . . . yet such charges should be so drawn as to bring the alleged act of misconduct clearly within the purview of the statute *and should specify the time and place when and where such prohibited act was committed.* The right to proper notice and a sufficient and explicit charge is not procedural but substantive. In the absence of such charges being filed the State Board of Dental Examiners would have no jurisdiction either to proceed with the hearing against the accused or to make a decision therein." (Italics ours.)

He places great stress on the language "and should specify the time and place when and where such prohibited act was committed." It is apparent from the reading of this case that the complaint was completely

inadequate in every respect. In Tarr v. Hallihan, 375 Ill. 38, the Kalman case is discussed. The court said as to the Kalman case: ". . . it is not controlling here. The basis of that decision . . . was that no charges, as a matter of fact, had been filed against the dentists involved, but that they were merely notified the department was going to conduct a hearing in the nature of an investigation by a grand jury to determine whether or not they had violated any of a number of provisions of the Dental Practice Act." Later in the same case the court said: "It is sufficient that the practitioner be fairly and reasonably apprised of the acts of misconduct with which he is charged so that he may properly prepare to defend such charges." This would seem to be a proper test for determining whether or not the complaint in the instant case is sufficient.

■ Is the complaint as filed in the instant case definite enough to reasonably apprise plaintiff of the charges against him even though the place of the occurrence of the prohibited act was not specified? In the case of In re Van Hyning, 257 Mich. 146, this issue was discussed. The charges against Van Hyning were as follows:

"Violation of Section 3, p. 6 of Act No. 237, Pub. Acts of 1899 as amended, 'grossly unprofessional and dishonest conduct' as defined in this section, and in particular with having professional connection with and lending your name to an unlicensed individual in the person of Harry M. Hoxsey, who on March 9, 1931, examined and diagnosed an alleged physical condition in one Otto Fischel. Further that said Harry M. Hoxsey is not licensed to practice medicine in the state of Michigan."

In deciding that this was a sufficient complaint to give the board authority to revoke the physician's license, the court said at p. 148–9:

511

"It is claimed that these charges were not sufficiently specified. It is true that they were not stated as clearly and connectedly as they probably would have been if drafted by a lawyer. In proceedings of this kind it is not necessary that they be stated with that exactness required of court pleadings. It is sufficient if they inform the defendant with substantial certainty in what manner he has been guilty of unprofessional and dishonest conduct. . . . We think it was stated with sufficient certainty to reasonably inform him of what he was required to answer when he appeared at the hearing."

Plaintiff in the instant case was certainly afforded a more specific and more adequate complaint than was the physician in the above Michigan case. It is inconceivable that plaintiff was placed at any disadvantage by virtue of the omission complained of. The fact that the complaint did not say that this all happened in Chicago did not prevent plaintiff from understanding the charges against him or from preparing a defense. There is no question but that plaintiff was informed as to where his alleged misconduct occurred long before the hearing. Defendant's discovery deposition dated June 27, 1950 (five months before the hearing) stated that this all occurred when she visited his office. The complaint itself stated that both complainant and plaintiff lived in Chicago, and also gave the date of the occurrence in question. We conclude that the amended complaint was sufficient to apprise plaintiff of the charges made against him.

The second contention of plaintiff that we will consider is that the evidence does not support the findings of the Special Medical Examining Committee, which were approved by the director of the Department of Registration and Education and affirmed by the trial court.

The findings of the Commission were as follows:

"1. That the respondent, Peter B. Schyman, is duly licensed to practice medicine in all its branches in the State of Illinois.

"2. The Committee finds from the evidence that the respondent, Peter B. Schyman, holds himself out as a specialist in various branches of medicine; that in the Red Book, Chicago Classified Telephone Directory of December, 1950, the said Peter B. Schyman is listed under the following medical classifications:

 a. Physician and Surgeon
 b. Chiropractor
 c. Osteopath
 d. Naturopath

"3. The Committee further finds from the evidence that on December 15, 1949, Mrs. Marjorie Taylor, also known as Marjorie Hackett, went to the office of Dr. Peter B. Schyman at 1869 North Damen Avenue, Chicago, Illinois; that at this office on the above mentioned date, she talked to the respondent, Dr. Peter B. Schyman, and told him she was a diabetic and 'heard it is possible to obtain from you the medicine that used to be available in Indiana and I want to get some'; that Dr. Schyman then told Mrs. Taylor to sit down and he would talk to her in a few minutes, that he was busy with another patient at the present time.

"4. That thereafter Mrs. Taylor left the office of Dr. Peter B. Schyman at 1869 North Damen Avenue, Chicago, Illinois, but called him on the telephone on the same evening to apologize for leaving and to make another appointment for the next day, to-wit: December 16, 1949; that in said telephone conversation Dr. Peter B. Schyman asked Mrs. Taylor, among other things, how long she had had diabetes and how much insulin she was taking and other questions pertaining to her statement that she was suffering from diabetes for three and one-half years.

"5. That another appointment was made for Mrs. Taylor to return to the office of Dr. Peter B. Schyman

at 1 p. m., on December 16, 1949, in Chicago, Illinois; that at the said time Mrs. Taylor did appear at the office of Dr. Schyman at 1869 North Damen Avenue, Chicago, Illinois. After a short wait the said Mrs. Taylor was taken into a room off the reception room, commonly called a consulting room, by Dr. Peter B. Schyman; that the said Dr. Peter B. Schyman then proceeded to examine Mrs. Taylor; that the said Dr. Peter B. Schyman took her blood pressure, examined her heart and analyzed a urine specimen that the said Mrs. Taylor had brought with her to the doctor's office.

"6. That during said examination Mrs. Taylor again said to Dr. Schyman that 'she wanted to get this new medicine, because I was tired of taking insulin hypodermically'; that Dr. Schyman then told Mrs. Taylor that this medicine was new stuff and that the people who made insulin objected; that the said Dr. Schyman further told Mrs. Taylor 'Well, of course you understand that you can't cut out insulin right away, that you use this stuff and it reactivates your glands so that you should be able to cut down the use of insulin gradually, probably at the rate of five units a month.' That Dr. Schyman further told Mrs. Taylor it was a new medicine and that he had become interested in it through a patient of his, a Mrs. Kaadt and through her he was able to make this stuff available to diabetics and that he was organizing a research institute for the purpose of finding a new cure for diabetes; that after said conversation and examination the said Dr. Peter B. Schyman said he would get the medicine for Mrs. Taylor and the said Mrs. Taylor returned to the reception room.

"7. The Committee further finds from the evidence that the medicine was then brought to Mrs. Taylor; that a further conversation was then held between Mrs. Taylor and Dr. Schyman as to how to take the medicine; that the said Dr. Schyman asked Mrs. Taylor

when she would return for some more and being advised that Mrs. Taylor would be back in Chicago around Easter, Dr. Schyman then said as follows: 'Ordinarily people take three tablespoonfuls a day in a glass of water before each meal'; that he then advised Mrs. Taylor if she took the said medicine in the above dosages, the gallon of medicine would not last until the middle of March; that then the said Dr. Peter B. Schyman gave Mrs. Taylor written instructions, that is known as Relator's Exhibit No. 1, in this proceeding on specific directions to take said medicine; that said directions called for teaspoonfuls in lieu of tablespoonfuls and a reduction as ordinarily taken as above mentioned; that for his services and medicine Mrs. Taylor paid to Dr. Schyman the sum of thirty (30.00) dollars.

"8. The Committee further finds from the evidence that the medicine given to Mrs. Taylor is not in fact, nor is there any reputable medical learning or opinion indicating that it is, either a cure, or preventive for diabetes and that the administration thereof is without therapeutic value in diabetes cases.

"9. The Committee further finds that the respondent's statement to Mrs. Taylor that this medicine or material reactivates your glands so that you should be able to cut down the use of insulin gradually, probably at the rate of five units a month, is not a statement in accordance with any reputable medical learning; it was false and was either known by the respondent, Dr. Peter B. Schyman, to be false or was made by him with reckless and wilful disregard as to truth or falsity. Wherefore, the Committee finds said statement false, fraudulent and of no value.

"10. The Committee, therefore, finds and declares that the respondent, Dr. Peter B. Schyman, has held himself out to treat human ailments by making false statements, by making false claims of his skill and by making false claims as to the efficacy and value of his

515

medicine and remedy, knowing such statement to be false within the purview of Paragraph 8 of Section 16 of the Illinois Medical Practice Act.

"11. The Committee further finds that the respondent, Dr. Peter B. Schyman, does not possess the personal or professional fitness to practice medicine in all its branches."

The record of the testimony upon which the Committee based its findings reveals that four witnesses testified for defendants. Marjorie Taylor testified that on December 15, 1949, she went to plaintiff's office with John Hoder, an inspector for the Department of Registration and Education of the State of Illinois. This was done at the suggestion of Norma Lee Browning, a reporter for the Chicago Tribune. Hoder introduced himself and her to plaintiff as Mr. and Mrs. Hackett from Pana, Illinois. She talked to plaintiff and told him she was a diabetic; that she had heard it was possible to obtain from him medicine that was formerly available in Indiana. Plaintiff told her to wait, that he was busy and would be with her in a few minutes. She and Hoder left. She called plaintiff that evening on the telephone and apologized for leaving. She made another appointment for the next day. In her telephone conversation with plaintiff she was asked how long she had had diabetes and how much insulin she was taking. She told him she took twenty-five units of regular insulin once a day in the morning; that she had had a blood sugar test about six months ago and that her urinalysis was all right. Plaintiff suggested that she go to a certain laboratory to have her urine tested. The next day, December 16, 1949, accompanied by George Woltman, a reporter for the Chicago Tribune, she went to plaintiff's office. Woltman was introduced to plaintiff by Mrs. Taylor as her brother-in-law. After a short wait she went into a consultation room with Bernice Martin, a part time receptionist, who took her case history. She had a specimen of urine with her.

Shortly thereafter plaintiff came into the room and proceeded to examine her. He took her blood pressure and analyzed the urine specimen. He asked her if she had gone to the laboratory to have her urine tested and she said that she had not; that it was not convenient for her to do so. When he returned he told her that she should drink goat's milk, that it was better than cow's milk. He asked her if she took vitamins and she told him that she did not. He told her that she should take them. He asked her if she ate candy and she told him that she did not; that when she craved something sweet she ate dates. He told her that dates were fine and that she could use honey or dried fruit. She told him she wanted to get his new medicine because she was tired of taking insulin hypodermically. Plaintiff told her that ordinarily he didn't prescribe the medicine to someone who had not taken it but if she wanted to try it there was no reason why she shouldn't. He told her that it was new stuff and that people who made insulin objected because they have a good thing in insulin; that the discovery of insulin probably set back the research for a cure for diabetes one hundred years; that insulin controls the disease but doesn't cure it; that you have to keep taking it always. She told him that that was why she wanted to try the new stuff. Plaintiff told her that she could not cut out insulin right away; that the use of the new medicine reactivates the glands so that she would be able to cut down the use of insulin gradually, probably at the rate of five units a month; that if she was taking twenty-five units now, and took the new medicine, she could get along with twenty units of insulin the first month, fifteen units the next month, and so on. He said he became interested in the medicine through a patient of his, a Mrs. Kaadt who had come to him as a heart patient and was also a diabetic; that through her he was able to make the medicine available to other diabetics, and that he was organizing a research institute

517

for the purpose of finding a cure for diabetes; that this was what he was working on in his research institute.

Plaintiff excused Mrs. Taylor and she went out to the waiting room. Shortly thereafter Mrs. Martin, plaintiff's receptionist, came out carrying a one-gallon jug of the medicine. She put it in a paper shopping bag and handed it to Mr. Woltman. Mrs. Taylor then asked to see the plaintiff to get directions about taking the medicine. She went to a place in his office with a sign over it that said "pharmacy." He told her he was looking for some vitamins for her and she said that she would get them at the drug store. He gave her directions for taking the medicine. Plaintiff asked her when she would be back in Chicago and she told him around Easter. He told her that she was to take three tablespoons of the medicine a day; one tablespoon in a glass of water before each meal; that if she took the medicine in those dosages the gallon would not last until the middle of March. He then gave her written directions as to the taking of the medicine. She paid him $30 for it. On cross-examination she admitted that she did not have diabetes; that Miss Browning of the Tribune asked her to go to plaintiff's office to get material for a story; that she used the name of Marjorie Hackett at Miss Browning's suggestion; that she did not live in Pana, Illinois; that Mr. Woltman was not her brother-in-law; that she had never taken insulin; that she made a report of her visit to plaintiff's office.

Mr. Albert A. Uebbing, a witness for defendants, testified that he was an analytical chemist, employed by the Miner Laboratories in Chicago, Illinois; that a gallon of medicine marked "diabetes medicine" was delivered to him with a letter from the managing editor of the Tribune. He made a qualitative analysis limited to vinegar, saltpeter and a malt product. This was a partial analysis. A report of the test was sent to the Chicago Tribune, attention Miss Norma Lee Browning.

Dr. Robert W. Keeton, testifying for defendants, said he was a physician and a professor of medicine. He was licensed to practice medicine in all its branches in 1916. He was the head of the Department of Medicine, and professor of medicine at the University of Illinois. He specializes in internal medicine, with special reference to diabetes and metabolic disorders. He belongs to the Chicago Medical Society, the Illinois Medical Society, the Institute of Medicine and the Chicago Society of Internal Medicine. (The parties stipulated that he was well qualified to testify as a witness.) He examined the report of the analysis made by Mr. Albert A. Uebbing and stated that the medicine in question containing vinegar, saltpeter and a malt product would have no therapeutic value in the treatment of diabetes. He said that he knew of no medicine that could be taken by mouth that had any therapeutic value in the treatment of diabetes; that about twenty-five years ago a compound was used but that it was found that it damaged the liver and had no true therapeutic effect; that the various elements contained in the medicine had no therapeutic value in the treatment of diabetes. In the course of his practice he had never prescribed or used a compound containing any of the elements mentioned in the report in the treatment of diabetes. He said that honey was not harmless for a diabetic, and that doctors do not normally prescribe dates and things of that kind for diabetes.

George G. Woltman, a reporter for the Chicago Tribune, testified for defendant. His testimony corroborated Marjorie Taylor's statements as to her going to the office and meeting with plaintiff's employee, Mrs. Martin. He did not hear any of the conversation between Mrs. Taylor and Mrs. Martin when she went into the consultation room, nor between Mrs. Taylor and plaintiff when she was in his office. He corroborated the testimony between Mrs. Taylor and plaintiff when she

519

came out of plaintiff's office and received directions from plaintiff as to the taking of the medicine contained in the one-gallon jug.

The testimony introduced by plaintiff was his own and that of his employee, Bernice Martin. Plaintiff testified that he was a general practitioner and did not specialize in any particular branch of medicine; that he did not hold himself out as a specialist in the treatment of diabetes; that Mrs. Taylor visited his office as a patient on the 15th and 16th of December; that he did not tell her he had a certain medicine that would aid her in eliminating the use of insulin in the treatment of diabetes, and that he was of the opinion she was not suffering from diabetes. After questioning and examining Mrs. Taylor he came to the conclusion she had nervous indigestion; that she might have thought she had diabetes but that as a result of his diagnosis he excluded it entirely; that he did not prescribe anything for her that was intended as a remedy for diabetes; that the medicine he prescribed was to improve her appetite and not to help her with diabetes, but that she insisted on having some of the medicine and as a matter of fact she stated she wanted a whole gallon of it. The other part of his testimony on direct examination was a contradiction of all the statements made. by Mrs. Taylor.

On cross-examination he said that he was listed in the Red Book, the Chicago classified telephone directory, as a physician, as a chiropractor, as an osteopath and as a naturopath. He said he had special courses in chiropractic and a degree in it. He gave adjustments in connection with physical therapy. The purpose of the listing under the heading of chiropractors was to inform the public if they wanted chiropractic treatment they could get it from him. A chiropractor holds himself out as a chiropractor for manipulation and you could call him a specialist in that particular field. He gave physical therapy and that in a sense is a special-

ization in the field of medicine. He studied osteopathy and practiced it and is licensed as an osteopath. He authorized the placing of his name in the Chicago classified telephone directory under the various classifications by the R. H. Donnelley Corporation. He stated that he also did rupture work and fitted trusses to patients. He is not listed in the telephone book in connection with this. Another party runs the truss business. The other party calls him in to make examinations for rupture.

Plaintiff said the reason he gave Mrs. Taylor the gallon of medicine was that she had asked for an acid-tasting medicine. He didn't know whether this was exactly what she wanted but she was insistent. He said she had a neurotic or psychogenesis factor involved in her demeanor or conduct; that he wasn't the type of a doctor to hold out something if a patient insists on it so long as it is not poisonous and if she thinks it is going to help her she can take it; that he was not a psychiatrist but since she insisted and was nervous, apprehensive, fidgety and restless he would let her have the medicine. When a patient goes to a doctor it is his duty to tell the patient what he has unless there is some other factor. Mrs. Taylor was a neurotic and a psychotic in his opinion. He said he knew of no cure for diabetes and no treatment other than the standard exercise and insulin and that the discovery of insulin set it back one hundred years. He said he was not a psychiatrist and that when he had mental patients he referred them to a psychiatrist. He was treating her mentally. He admitted he told her that if her condition continued she could reduce the insulin.

The testimony of Bernice Martin, plaintiff's employee, corroborated the interview with Mrs. Taylor on December 16. She said that Mrs. Taylor told her that she was tired, nervous and had no pep nor ambition; that she mentioned something about an acid-tasting medicine that she wanted in order to gain weight and

521

appetite. Mrs. Taylor said she had diabetes and that she took insulin on and off moderately. No testimony was introduced by plaintiff to deny that of the analytical chemist and Dr. Robert W. Keeton.

Eleven findings were made by the Medical Committee. The first ten findings are on questions of fact. Finding No. 11 is to the effect that the Committee finds that "the respondent, Dr. Peter B. Schyman, does not possess the personal or professional fitness to practice medicine in all its branches."

■ ■ The license to practice medicine is a very valuable right to plaintiff. If he is deprived of it he might well lose his means of livelihood. For this reason the burden is not only on the defendants to prove their case but they are required to do it by so-called "clear and convincing evidence." Schireson v. Walsh, 354 Ill. 40, 45. However, when the Committee has made its findings which were adopted by the Director of the Department and affirmed by the trial court, then this court cannot reverse unless it appears to us that the ruling is against the manifest weight of the evidence. As we understand it, we must balance this requirement of "clear and convincing evidence" against the limitation on our own power to review. We have, therefore, first examined the record to determine whether in the first instance it could be said that the evidence presented by the defendants was clear and convincing. We find that it was. While it is true that the plaintiff denies much of the testimony we are of the opinion that this denial does not weaken the clear and convincing character of the defendants' case.

■ ■ Society places itself in the hands of plaintiff's profession for protection of the life and health of the community. The practice of medicine, in addition to skill and knowledge, requires honesty and integrity of the highest degree. A patient that goes to a doctor is entitled to believe that as a result of his skill, knowledge and integrity he will honestly diagnose his com-

plaints of illness. When medication is prescribed to a patient as a result of a diagnosis, he is entitled to trust that it will have the necessary therapeutic and curative value to help alleviate or cure the illness of which he complains. The state under its police powers has the duty of protecting society from those of the profession who are not qualified to be the recipients of this trust. In this connection the state has the power to enact comprehensive, detailed and rigid regulations for the practice of medicine. People v. United Medical Service, Inc., 362 Ill. 442.

Inherent in this power of the state is the right to revoke the license of those who violate the standards it sets. Paragraph 8 of Section 16 of the Illinois Medical Practice Act (Ill. Rev. Stat. 1953, ch. 91, sec. 16a, par. 8) specifically provides for revocation and suspension of license or certificate of any person for "holding one's self out to treat human ailments by making false statements, or by specifically designating any disease, or group of diseases and making false claims of one's skill, or of the efficacy or value of one's medicine, treatment or remedy therefor."

An examination of the testimony of Marjorie Taylor and the other witnesses for the defendant shows that plaintiff prescribed medicine that he knew to be of no therapeutic value. He argues that Marjorie Taylor admitted that she did not have diabetes; that she came to his office at the behest of a newspaper reporter who desired to get a story. While these statements are correct, an investigation to apprehend those who violate the standards of the medical profession would be impossible if the investigator told the doctor she had no illness or cause for complaint. In the instant case when Marjorie Taylor came to plaintiff's office for treatment it was his duty to properly diagnose her case. The diagnosis he claims to have made, but did not tell her of, was that she was a neurotic and a psychotic. If this was true he should have told her and sent her

to a psychiatrist. He should have honestly informed her that she had no diabetes. If this had been done there would have been no cause for complaint. If he was to have taken her statements as true that she had diabetes and had prescribed medication that had the necessary therapeutic or curative values, again there would have been no cause for complaint. Instead, he pretended to diagnose her condition and prescribed a medicine which had no curative or therapeutic value and made a charge of $30.

■ In examining the testimony of Marjorie Taylor we find little, if any, discrepancy between her testimony on direct examination and on cross-examination. The same applies to the other three witnesses for defendant. On the other hand, there are marked discrepancies between plaintiff's testimony on direct examination and on cross-examination. In many instances his answers were evasive and not responsive to the question. An examination of his testimony leads to but one conclusion: that he held himself out as a specialist in the field of medicine, chiropractic, osteopathy, naturopathy, and in the treatment of ruptures. The Committee did not believe his statements that he did not hold himself out to Marjorie Taylor as a specialist in diabetes, and there is no basis for disturbing this finding. After reading his testimony we can readily see why the Committee placed little credence in his statements.

Plaintiff's third contention is that the admission in evidence of certain records of conviction in another state involving persons and criminal charges in no way connected with plaintiff constituted fatal error. The Medical Examining Committee permitted the introduction of certified copies of the opinions of an Indiana court and certified copies of judgment and conviction orders of Charles F. Kaadt and Peter S. Kaadt who were associated with the Kaadt Institute at South Whitley, Indiana. The record contains evidence from which an inference may be drawn that the medicine

sold by plaintiff to Marjorie Taylor had some similarity to that prescribed by the Kaadt Institute at South Whitley, Indiana. We are of the opinion that in a court of law such conviction records would not have been sufficiently relevant for admission into evidence. However, an examination of the findings of the Committee in the instant case does not reveal that the Committee relied upon or even mentioned the Kaadts' convictions.

█ Under the circumstances, were these records of conviction of such a nature that they prejudiced the Committee so that plaintiff did not have a fair and impartial hearing? Plaintiff cites Com'r of Union Drain Dist. No. 1 v. Smith, 233 Ill. 417; City of Naperville v. Wehrle, 340 Ill. 579, and Smith v. Department of Registration & Education, 412 Ill. 332, as supporting this contention. In each of these cases the court reversed the agency's order because of a biased hearing where the prejudice was direct, personal and present from the inception of the hearing. It was capable of demonstration from the very beginning by the acts of the agency. In the instant case, the prejudice, if any, was created by the admission of the certified copies of the conviction of the Kaadts, which at best was irrelevant evidence. The admission of irrelevant evidence in administrative proceedings does not of itself require the reversal of the order of the administrative agency where there was independent probative evidence to support the order. In Sisto v. Civil Aeronautics Board, 179 F.2d 47, the revocation of a pilot's license by the Civil Aeronautics Board was involved. Defendant objected to the admission of his two prior violations of regulations which were of a somewhat different nature. The court held at pp. 51–52 that:

"The admission of irrelevant or incompetent matter before an administrative agency does not constitute reversible error, if there is substantial evidence in the record to sustain the agency's determination. This being the case prejudice cannot be alleged to the admis-

sion of improper evidence *unless it be shown that the board relied on it* . . . the Board itself in its findings, conclusions and orders took no notice thereof and in no way relied on them or even mentioned them. It found substantial grounds *aliunde* for supporting its order. Assuming therefore, *arguendo,* that these amendments were improper and irrelevant, the petitioner still cannot predicate error on their admission. *And even less can he claim prejudice when he cannot demonstrate it."* (Italics ours.)

To reverse the findings of the Committee under such circumstances where it cannot be shown that the administrative board was prejudiced would amount to requiring such an agency to follow formal legal rules of evidence which it is not equipped to do.

As to the fourth point, that the delegation to the Medical Examining Committee to pass upon purely legal questions constitutes an illegal subdelegation of power, counsel for plaintiff argues that the members of the Committee passed upon purely technical legal questions with reference to the admission of evidence which they were not competent to do, and that upon questions of admission they relied upon counsel for the agency and as a result he acted as both prosecutor and judge.

The Medical Practice Act provides that the hearing be conducted by a Committee of five qualified doctors. In the instant case the Special Medical Examining Committee was specially appointed after plaintiff had filed a petition for change of venue from the original medical examining committee. No question was raised as to their competence or ability. From our examination of the record, the hearings were conducted fairly, impartially and in an orderly manner. Our examination also reveals no prejudice or preconceived notions on the part of any of the members of the Committee. They made their findings based on evidence that was properly before them.

 The report of the Committee was filed with the director. Plaintiff filed his objections thereto. The director approved the report of the Committee. It is clear that the Medical Examining Committee exercised no final decision-making powers. It was merely a fact-finding body that made recommendations in a report to the director. Bodenweiser v. Department of Registration & Education, 347 Ill. 115, 121; Schireson v. Walsh, 354 Ill. 40, 45; Smith v. Department of Registration & Education, 412 Ill. 332, 333; Chicago College of Osteopathy v. Puffer, 3 Ill.App.2d 69. The director, though not possessing power to act without the Committee's recommendations, in his sole discretion decides whether the Committee's findings and recommendations shall be adopted by him and become final or the matter returned to the Committee for rehearing. (Ill. Rev. Stat. 1953, ch. 91, secs. 16b—1, 16d; ch. 127, secs. 60, 60a.) An appeal may be had to the circuit or superior courts only if he adopts the findings and recommendations of the Committee. The Act empowered the director to exercise these quasi-judicial powers that were incidental to its administration. The hearing was not a judicial proceeding. The fact that in the performance of the duties imposed on the director under the Medical Practice Act it was necessary for him to exercise judgment and discretion does not constitute the exercise of judicial power. Toplis & Harding, Inc. v. Murphy, 384 Ill. 463; Department of Finance v. Gandolfi, 375 Ill. 237. Likewise under the Act, the Medical Examining Committee, acting as a fact-finding body that made the report to the director, was not exercising judicial power and its acts were not an illegal and unconscionable subdelegation of that power. Under the circumstances we do not see any merit to this contention of plaintiff.

 As to acts of the attorney for the agency, the record does not reveal that he acted both as prosecutor

527

and judge. We find nothing in the record to indicate that the Committee relied on his advice in making its rulings. He presented his arguments as an advocate in the same manner as counsel for plaintiff. This contention likewise has no merit.

The order of the trial court is affirmed.

Order affirmed.

McCORMICK, P. J. and SCHWARTZ, J., concur.