Richard M. Rutledge, M.D., Plaintiff-Appellant, v. Department of Registration and Education of the State of Illinois, William Sylvester White, Director of Registration and Education, and Kathryn M. Ford, Defendants-Appellees.

Gen. No. 50,808.

First District, First Division.

November 21, 1966.

---

* SHA Const Art VI, § 7; Ill Rev Stats (1965), ch 110, §§ 101.30 and 101.31 relating to new trials, injunctions and receivers.

Morris A. Haft, of Chicago, for appellant.

William G. Clark, Attorney General of the State of Illinois, of Springfield (Richard A. Michael, Philip J. Rock, A. Zola Groves and John J. O'Toole, Assistant Attorneys General, of counsel), for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is an administrative review action. Plaintiff appeals from an affirmance by the Circuit Court of a "revocation order" entered by the Department of Registration and Education of the State of Illinois, which revoked the license of Richard M. Rutledge to practice medicine in the State of Illinois.

The report of the "findings and recommendation" of the Medical Examining Committee of the Department, on which the "revocation order" was based, shows that Velma Meyer went to the office of plaintiff, and after an examination was informed by him that she was pregnant.

After giving $200 in currency to his assistant, Mrs. Kelso, the plaintiff inserted an instrument in her "for the purpose of aborting her," and then "inserted packing into her cervix." She was given pills to take every three hours and was sent home. The following day her legs were stiff, and she experienced cramps. She continued to take the pills and "removed the packing and took a douche." She made several unsuccessful trips to plaintiff's office to see him, and "finally, on July 19, 1958, Mrs. Meyer did see the Respondent in his office and complained to him of the pains across her back. Respondent examined her and advised her she was still pregnant. He further advised her to go home, get her things and stay all night and that it would cost her Two Hundred Dollars ($200) for another abortion. She replied that she did not have the money and Respondent advised her that he could do nothing for her and she went home in great pain. That on the evening of July 19, 1958, Dr. William Cutter, Jr. was called and she was moved to the Pekin Hospital in Pekin, Illinois, where she remained for thirty-two (32) days. Dr. William Cutter, Jr. diagnosed her case as "Septic Abortion with a Septic Fulminating Peritonitis."

The findings conclude with paragraph 6: "That the Respondent, Dr. Richard M. Rutledge, did on July 3, 1958, perform an incomplete abortion on Velma Meyer which resulted in permanent injuries to said Velma Meyer in the nature of an enlargement of the left leg, pains extending downward from above the left knee to above the left foot, pain in the right foot and in the lumbar region of the back and across the hips. That said abortion was the cause of Velma Meyer developing peritonitis and thrombophlebitis of the left lower extremity, resulting in said permanent injuries above mentioned."

On appeal, plaintiff contends: (1) that the charge in the complaint and amended complaint was not specific

107

and, failing this, the medical committee and the Department of Registration and Education were without jurisdiction to proceed thereon; (2) that the proceedings to revoke his license were not commenced within three years of the commission of the prohibited act, as required by the Medical Practice Act; (3) that the order of revocation is against the manifest weight of the evidence; (4) that plaintiff was not tried by an impartial committee, and that the attorney representing the committee did not conduct himself with the same respect for fairness as was required by the committee; and (5) that plaintiff has been deprived of due process of law.

The briefs of both parties consider and argue that the instant proceedings were covered by the provisions of section 60c of the Civil Administrative Code (Ill Rev Stats, c 127). We do not agree. In Schireson v. Walsh, 354 Ill 40, 187 NE 921 (1933), it is said (p 53):

> "Section 60c of the act of 1927 attempts to cover substantially the same ground as section 17 of the Medical Practice act but varies therefrom in many material particulars. . . . As applied to physicians the act of 1927 is unconstitutional, being in violation of section 13 of article 4 of the constitution."

See, also, Kalman v. Walsh, 355 Ill 341, 343, 189 NE 315 (1934); People v. Thompson, 387 Ill 134, 56 NE2d 618 (1944).

The statutory procedure to be followed for the "revocation or suspension" of a medical license is set forth in section 16b of Chapter 91, Medicine and Surgery (Ill Rev Stats 1959). That section provides that a citation, signed by the Director, be issued, and that the license holder be summoned to appear at a hearing before the Department. "No citation shall be issued except upon a sworn complaint, filed with the department, setting forth the particular act or acts charged against the

person to be cited." At the hearing, the respondent "shall be accorded ample opportunity to present to the department in his defense, in person or by counsel, such statements, testimony, evidence and argument as he may desire to bring to its attention." The record shall be "the citation, answer and all other documents in the nature of pleadings filed in the proceedings, and the transcript of testimony." In section 16b–1 it is provided that the action or report in writing of a majority of the examining committee shall be sufficient authority upon which the Director of Registration and Education may act.

The revocation proceedings were commenced on June 23, 1961, by a verified complaint filed with the Department by Kathryn M. Ford, relator, as follows:

"1. Relator is and was at all times referred to herein a duly appointed employee of the Department of Registration and Education of the State of Illinois, and in such capacity she is duly authorized to, and does on behalf of said Department, make this complaint against the respondent.

"2. Respondent is and at all times referred to herein was duly licensed to practice medicine in all of its branches in the State of Illinois.

"3. That on or about the 3rd day of July, A. D., 1958, the said respondent, Dr. Richard M. Rutledge, did professionally treat and/or perform surgery upon the person of one Velma F. Meyer, a female;

"4. That the said respondent was grossly negligent and said negligence resulted in the permanent injury to the said Velma F. Meyer.

"Wherefore, relator states that respondent is guilty of violation of Section 16, paragraph 3, of the Illinois Medical Practice Act and respectfully requests that the Department of Registration and Education of the State of Illinois investigate the

actions of the respondent in accordance with the provisions of the said Act."

The verification of the complaint states that Kathryn M. Ford "knows the contents thereof and the same are true except as to matters stated on information and belief to which she says she verily believes same to be true."

On July 31, 1961, a verified amended complaint was filed, dated July 7, 1961, which repeats the allegations of the complaint of June 23, 1961, with the exception of paragraph 4, which is restated and charges "that the said respondent was guilty of gross malpractice resulting in the permanent injury to the said Velma F. Meyer." A notice dated August 11, 1961, sent by registered mail, informed respondent that "a verified amended complaint has been filed in the above matter, a copy of which verified amended complaint is hereto attached and made a part hereof." Motions made by respondent to strike the complaint and amended complaint were denied.

The hearing of witnesses by the Medical Examining Committee commenced on November 9, 1961, and, with intervals, concluded on January 17, 1963. Subsequently, the committee filed a report of its "findings and recommendation," signed by seven doctors and dated April 24, 1963. After respondent's motion for rehearing had been denied, the Director of the Department of Registration and Education entered a "revocation order" on July 2, 1963, which adopted the findings and recommendation of the Medical Examining Committee and revoked the license of plaintiff "to practice medicine in all its branches in the State of Illinois."

Initially, we consider plaintiff's contention that the charge in the complaint and amended complaint must be specific. Plaintiff asserts that he "has maintained that the Complaint originally filed in this cause was in fact no complaint at all and has likewise maintained that the amended complaint filed without notice to the plaintiff

did not constitute a complaint whatsoever," and that "plaintiff took the step required to be taken, i. e., filed a motion for a bill of particulars or a more specific complaint, and that motion was overruled."

We note here that the record shows that plaintiff's motions for a bill of particulars were denied by the committee, and plaintiff did not waive or abandon these motions, as defendant indicates in its brief.

In support of the contention that the complaint should have made "clear and specific charges, giving time, place and acts of misconduct with reasonable certainty," plaintiff's authorities include Kalman v. Walsh, 355 Ill 341, 189 NE 315, where it is said (p 346):

> "In a proceeding of this nature due process of law requires a definite charge, adequate notice, and a full, fair and impartial hearing. . . . While it is not necessary that charges of professional misconduct, proof of which would justify the suspension or revocation of the license of the practitioner, should be drawn with the same accuracy and certainty as an indictment or information in a criminal case or with the refinements, niceties and subtleties of pleadings in courts of record, yet such charges should be so drawn as to bring the alleged act of misconduct clearly within the purview of the statute and should specify the time and place when and where such prohibited act was committed. The right to proper notice and a sufficient and explicit charge is not procedural but substantive. In the absence of such charges being filed the State Board of Dental Examiners would have no jurisdiction either to proceed with the hearing against the accused or to make a decision therein."

Also, Smith v. Department of Registration and Education, 412 Ill 332, 106 NE2d 722 (1952), where it is said (p 344):

111

"Appellant has charged throughout these proceedings that the complaint upon which he was tried is legally insufficient. It has been repeatedly held in this State that the revocation of a license of a professional man carries with it dire consequences. It not only involves necessarily disgrace and humiliation but it means the end of his professional career. In a proceeding so serious, due process of law requires a definite charge, adequate notice, and a full, fair and impartial hearing."

The defendant contends that "an examination of the complaint and the amended complaint established that the plaintiff was apprised of: (1) the date of the alleged offense; (2) the act performed; (3) the person upon whom the act was performed; (4) the charge that the acts amounted to gross negligence and gross malpractice; and (5) that said acts have caused permanent injury to the person upon whom they were performed."

 An examination of pertinent authorities shows that the instant proceeding is not a common law or criminal proceeding but an investigation, and in Joyce v. City of Chicago, 216 Ill 466, 471, 75 NE 184 (1905), the court said "it was not necessary that the charge should be formulated in technical language similar to that of a declaration or indictment," and the charge preferred should be in such form that the respondent could clearly understand the ground assigned. "Formality in proceedings before an administrative agency is not exacted by the courts. . . . A hearing before an administrative agency should not be a partisan hearing with the agency on one side arrayed against the individual on the other. Instead, it should be an investigation instituted for the purpose of ascertaining and making findings of fact. . . . The hearing should adhere reasonably to the procedure ordinarily followed in controverted matters." Gigger v. Board of Fire & Police

112

Com'rs of City of East St. Louis, 23 Ill App2d 433, 163 NE2d 541 (1960). In Schyman v. Department of Registration and Education, 9 Ill App2d 504, 133 NE2d 551 (1956), which was a medical license revocation proceeding, where it was contended that the complaint was insufficient, the court said (p 510):

> "[C]harges filed before an administrative agency need not be drawn with the same nice refinements and subtleties as pleadings in a court of record."

■ We conclude that the original complaint reasonably apprised plaintiff of the charges against him, so that he could properly prepare to defend such charges. It contained the date of the offense, the name of the person involved, the professional act, and the allegation that he was grossly negligent so as to cause permanent injury to the person on whom he performed the professional act. Although the original complaint did not set forth the statutory language, "gross malpractice resulting in permanent injury" (§ 16a of the Medical Practice Act, Ill Rev Stats 1959), we consider the charge of "gross negligence" adequate and within the purview of the statute. The exact statutory language was not required here.

■ Our conclusion that the charge in the original complaint was sufficient disposes of plaintiff's contention that the proceedings to revoke his license were not commenced within three years of the commission of the prohibited act. The date of the act charged was July 3, 1958. The revocation proceedings were commenced on June 23, 1961, and the amended complaint related back to the date of the filing of the original complaint. Simmons v. Hendricks, 32 Ill2d 489, 494, 207 NE2d 440 (1965).

Plaintiff further asserts that none of the allegations of the complaint or the amended complaint are made upon "information and belief," and that when such is

the case "the law requires the verification to be absolute." Authorities cited include Hovnanian v. Bedessern, 63 Ill App 353 (1896); People v. Jenner, 214 Ill App 321 (1919); and Village of Hinsdale v. DuPage County Court, 281 Ill App 571, 589 (1935), which involved the validity of an election under the provisions of the Illinois Liquor Control law, where the court decided that a petition which included a verification similar to the one contained in the instant complaint "was not properly verified," and "the county court acquired no jurisdiction to enter the order invalidating the election therein referred to." In Schireson v. Walsh, 354 Ill 40, 187 NE 921, the same point was urged but found waived.

■ ■ Although a sworn complaint is required by section 16b of Chapter 91, no form of verification is set forth. Where the statute requires "a sworn complaint," but does not prescribe the form of verification, we assume that such a complaint should be verified by affidavit in the same manner as complaints in civil cases may be verified, and "the affidavit should be in such form as to subject the party making it to a prosecution for perjury in case the matter sworn to proves to be false," and "in the same manner as bills in chancery may be verified." See Farrell v. Heiberg, 262 Ill 407, 409, 410, 104 NE 835 (1914), and Girhard v. Yost, 344 Ill 483, 486, 176 NE 899 (1931). Although the instant complaint does not specify that any of the charges are made upon information and belief, the relator does verify "that she knows the contents . . . are true." This was sufficient to subject her to prosecution for perjury in case the charge that the "respondent was grossly negligent and said negligence resulted in permanent injury to the said Velma F. Meyer" proved to be false. While the form of verification used here might not meet the requirements of a pleading in a court of record, we consider it adequate, given the facts and circumstances of this case.

■■ Notwithstanding that we are of the opinion that plaintiff's motion for a bill of particulars should have been granted, it was largely a matter for the discretion of the committee. The amended complaint met the guidelines set forth above, and the extended nature of the hearing gave the plaintiff ample opportunity to prepare his defense and to meet the testimony offered before the committee. We find no prejudicial error here.

■■ Considered next is plaintiff's contention that the order of revocation is against the manifest weight of the evidence. On administrative review, the court does not weigh the evidence, and its function is limited to ascertaining if the pleadings and decision of the administrative agency are against the manifest weight of the evidence. (DeGrazio v. Civil Service Commission of City of Chicago, 31 Ill2d 482, 489, 202 NE2d 522 (1964).) In order to reverse the administrative order, it is required that an opposite conclusion be clearly evident. Bruno v. Civil Service Commission of City of Chicago, 38 Ill App2d 100, 107, 186 NE2d 108 (1962).

The evidence considered by the Medical Examining Committee included testimony of witnesses for the relator and the respondent. The witnesses called on behalf of the relator included Velma Meyer, Dr. Cutter, three other doctors, and the former State's Attorney for Peoria County. The witnesses called on behalf of respondent included Dr. Rutledge, Helen Kelso (his office assistant), and Dr. Burton Finne.

The testimony of Velma Meyer, previously summarized, is fairly set forth in detail in the findings of the committee. She was cross-examined extensively by counsel for the respondent and said that she did not watch the plaintiff "all the time" on July 3, 1958—"I was crying half the time." She replied affirmatively to the question, "Did you see what he was doing all the time?"

Dr. Cutter testified that he was a general medical practitioner. He was licensed to practice in Illinois in 1941 or 1942. He was a member of the Tazewell County Medical Society and on the staff of Pekin Memorial Hospital. He saw and examined Velma Meyer at the Pekin hospital on July 19, 1958. He took her blood pressure, examined her abdomen, rectum, extremities, heart and lungs, and discovered that she had "a spiking fever of 103.6." He testified, "The patient was in shock. She had a severe peritonitis. She had a beginning thrombophlebitis of the lower left extremities, and the uterus was palpable in the abdomen." She was treated for "septic abortion with a septic fulminating peritonitis. . . . A septic abortion . . . is an abortion carried out under septic technique, . . . . The uterus becomes infected, and from there the infection spreads into the peritoneum and the peritonitis."

Dr. Cutter continued to treat her until the time of the hearing—"I saw her last on October 31, 1961, at which time she was still having trouble with her left leg. She has a persistent edema in the left lower extremity. After any type of standing or walking, there is a little enlargement of that leg, and she experiences pain in that leg after walking." In his opinion the condition was permanent, "I think she will have some trouble with that left leg for the rest of her life." She remained in the hospital for about a month, and Dr. Cutter called Dr. Helden for consultation four or five days after her admission to the hospital.

Dr. Cutter pointed out Dr. Rutledge in the hearing room—"The first time I did see him was when he came to my office of his own accord on . . . September 27, 1958. . . . Well, he wanted to talk to me about Mrs. Meyer at that time. . . . He asked me if I wouldn't try my best to put the soft pedal on Mrs. Meyer so that she wouldn't cause any trouble for him and stated that he thought that his type of operation was justified, and

we had quite an argument about that at that time. . . . I told him I had nothing to do with that, and that I was treating her strictly medically, and I would neither influence her one way or the other."

Dr. Helden testified that he was a medical doctor, licensed to practice in the State of Illinois in 1955. He examined Mrs. Meyer on July 24, 1958. "This patient was acutely ill with high fever and was apparently suffering from generalized peritonitis, and also a complete cessation of mobility of the intestines. She was a gravely ill patient when I saw her. Other things which developed shortly thereafter, on succeeding days, were a swelling of the left lower extremity, indicative of thrombophlebitis. . . . It is my opinion that the injury of those veins, in the deep venous system of the affected leg will probably be permanent." On cross-examination he stated he had not examined Mrs. Meyer after she was discharged from the hospital "about August 19th."

Dr. Hesseltine, an expert on obstetrics and gynecology, was questioned hypothetically.

Mr. Eugene M. Pratt testified that he was the former State's Attorney of Peoria County. Dr. Rutledge, upon invitation, appeared at his office in September, 1958, and was questioned about Velma Meyer. He denied treating her or performing an "illegal operation" on her. Velma Meyer visited his office and stated that she had an illegal operation performed on her and had a lot of bills to pay. He wanted her to sign a complaint, and she made no reply. She was told to wait in the reception room when Dr. Rutledge came over, and afterwards when Mr. Pratt looked for her, she was gone, and he never saw her again.

Dr. Julian, a licensed medical doctor in Illinois, a specialist in "cardiovascular surgery," examined Velma Meyer on October 29, 1962. She was 40 years of age and gave a history of a termination of a pregnancy. At the time he saw her, she was "complaining of pain in the

117

lower part of the back, pain in both buttocks regions, and pain extending down the posterior aspect of the left leg." Accepting her story in an objective fashion, it was his opinion that her complaint "was the type of pain that occurs . . . at the outset, associated with a post-phlebitic sympathetic dystrophy, a sympathetic pain severe, in which the patient protects the part from pressure of and dislikes examination." In his opinion, the pain was real and a scar on her extremity was not significant. When questioned as to whether the condition "will be permanent or of long duration," he replied, "I think that we can only answer that what happens to the patient in many instances it is that the pain is permanent; in other instances, it disappears, sometimes a long time after the injury. In other patients it is relieved by doing a sympathectomy." He replied affirmatively to the question, "Patients that have had thrombophlebitis or a disease of this nature are likely to have recurrences."

The respondent, Dr. Rutledge (plaintiff here), testified on his own behalf. He was licensed to practice medicine on June 21, 1921, and for a number of years he specialized in women's diseases. He first saw Velma Meyer on May 6, 1958, at which time he examined her. She claimed that she was pregnant, and he inserted a speculum to examine the cervix and found a large amount of foul-smelling vaginal discharge which ran into the basin. He could see nothing in the cervix that would indicate a pregnancy. He removed the speculum and then performed a bimanual examination to determine the size and position of the uterus, both of which were of normal size. He told her she was not pregnant. He received a $5 examination fee. He had rubber gloves on when he made the examination.

He saw her again on July 3, 1958, and she was very nervous and hysterical. He did not examine her that day, and she went home. Plaintiff further testified that "Velma Meyer did not pay me any money on July 3rd,

118

nor did she pay Helen [Mrs. Kelso] any money. She did not give me $200.00 in bills, nor did she give Helen $200.00 in bills. She tried to pay Helen $5.00 for the examination which she refused because there was no examination of this lady. I did not draw water in a bucket on July 3rd, nor did I tell Velma Meyer that she was pregnant. I did not insert a tube or instrument into the body of Velma Meyer on that date. I do not have a tube-like instrument in the office . . . I do have a tube which connects with the water supply, and that is the only tube that I have in my office. On that date that I tried to examine her I did not slap her leg, nor did I tell her to lie still. Neither at that time nor at any time did I insert any packing into the body of Velma Meyer. The next time I saw her was some time in the latter part of the third week or so in August of 1958. About a week before that time a man called me up relative to her and I went down to talk to Dr. Cutter. . . . Mrs. Meyer was the subject of our conversation. . . . He asked me why I was interested, and I explained to him that she thought she was pregnant and she had come to see me on May 6th, at which time I examined her and in my opinion she was not pregnant, but she had a bad case of what I thought was trichomonas vaginalis; that she came back to see me July 3rd and was hysterical after getting on the table prepared for an examination at which time she refused to allow me to examine her. I understand she was in the hospital and that you were her attending physician, and I would like to know what her condition was. He said . . . she had a septic abortion, . . . after some talk he said she was very sick . . . and I said, . . . I examined her with rubber gloves on May 6th. She apparently wanted me to examine her on July 3rd, but refused to let me. He said, well, you might have introduced some germs in her vagina on May 6th and they could have laid dormant there until some time in July and become active. I said, how in the world could

119

■■■■■■■■■■■■■■■■■■■■■■

they do that, so he didn't answer, and I said, well, Dr. Cutter, as far as a doctor, you couldn't carry your father's shoes, and I walked out."

Plaintiff further testified that he saw Velma Meyer after his talk with Dr. Cutter. "When she came in she had a plastic bandage on her left leg . . . and she told me it had a tendency to swell and I said, 'Well, you had some trouble before with that left leg due to an injury you said,' and she said, 'Yes, that's right,' and I said, 'Do you know a Mr. Brisson?' She said, 'Yes, he is my boyfriend.' I said, 'I want to know what is this idea of wanting $2,500 or $2,700.' She said, 'My God, you didn't give it to him, did you?' I told her that I didn't give it to him. The reason I saw Dr. Cutter was because he made that demand, . . . . She said, 'My doctor bills amount to about $1,200.00 and I should have about $1,500 for my troubles,' and I said, 'Your troubles were never caused by me, Mrs. Meyer.' " He also stated that Brisson called him a number of times, making demands on behalf of Mrs. Meyer. He further said, "I attended my office between July 3rd and the end of that month in 1958 and at no time did I ever refuse to see Velma Meyer, nor did I attempt to evade her in any manner. I wanted to help her. . . . Mr. Brisson was attempting blackmail and threatened to go to the State's Attorney's office, which he did do. The State's Attorney called me and I went to his office, but I did not sign a complaint against Brisson and Mrs. Meyer for the reason that I think that she is mentally off, and that Brisson was not much better."

Helen Kelso testified that she was employed by plaintiff as an office assistant for about 15 years. She knew Velma Meyer and met her first in April 1958 at the doctor's office, when Mrs. Meyer stated she thought she was pregnant and wanted the doctor to examine her. She was instructed to wait in the reception room, but when it came her turn to see the doctor, she had gone. She

appeared a week later and left shortly. She reappeared in May of 1958 and was examined then by plaintiff, in her presence. She described in detail the conversation between plaintiff and Mrs. Meyer and the equipment in the doctor's office. During the examination the doctor had rubber gloves on his hands. "His examination of this lady consisted of a vaginal examination, . . . and he looked in with a vaginal speculum. The examination took about ten minutes and the doctor told Mrs. Meyer that she was not pregnant. . . . She then gave me $5.00 for the examination." The next time she saw her was about two weeks later in the doctor's office. She wanted another examination, and after being told to wait in the reception room, she left.

On July 3, 1958, Mrs. Meyer appeared at the office, and plaintiff prepared to examine her, but she was in such a nervous condition, plaintiff was unable to proceed with the examination, and she gave Mrs. Meyer a sedative—"She didn't talk and when I asked her something she would just shake her head or she would nod. She remained in our offices approximately two hours which took in the time that she was in the treatment room. . . . She stayed there until nearly 5:00 and the doctor told her to come back on Monday . . . and she left. This was on July 3rd. The next time I heard from her was in the fall sometime, I would say September. . . . In the interim, however, she had called on the telephone several times and that would be after the 4th of July. . . . On the telephone she said to me why wouldn't the doctor examine her, and I told her that she didn't come back. . . . On occasion when she came into the reception room I did not recognize her immediately because she had dark glasses on and her hair covered with a babushka She would get up and walk around the reception room. . . . During the visits Mrs. Meyer made to our office he never had a long tubular instrument in his hand. I never distributed or gave Mrs. Meyer any so-called

blue pills. . . . Although Mrs. Meyer testified that the doctor drew water in a bucket from a faucet, he did not do so." Mrs. Meyer at no time gave her $200 in bills.

Dr. Burton Finne testified he was a general surgeon and licensed to practice in Illinois in 1930. He examined the record of the Pekin Hospital and the nurses' records, and said, "There is nothing in the State's exhibits numbered 28, 30, 31, 32, 33 and 34 purporting to be doctors' notes, progress notes and examinations of Velma Meyer to substantiate a diagnosis of septic abortion. I base my opinion on the fact that there is nothing to substantiate a diagnosis of septic abortion by virtue of the physician's failure to make a vaginal examination, failure to do a curretment in a fulminating case of peritonitis to clean out any secunda tissues, and failure of diagnosis of tissue. This woman could have had a general peritonitis from a dozen, innumerable causes which could have been due to an old standing salpingitis or . . . she could develop peritonitis due to a vaginal infection, or from a venereal disease or from an invading Strep., without any traumatic instrumentation. To me there is no significance of the statement that there is a history of a septic abortion about three months in age and the likelihood of developing a septic abortion three months after the instrumentation is very unlikely as the incubation period of the pathogenic organisms would be between 72 hours and a week at the latest. . . . Further, from the clinical evidence contained in the hospital records, I find that Velma Meyer suffered no permanent injury, however, from a reading of State's Exhibit No. 74, I understand she had a deep scar in her left leg which could be a predisposing factor for a thrombophlebitis." In his opinion, the rectal examination made by Dr. Cutter was inadequate.

A careful examination of this record shows that the findings of the Medical Examining Committee are substantiated by the evidence. A wide latitude was per-

122

mitted in the examination of all witnesses and members of the committee participated at length in the examinations. Although the record is marked with spirited exchanges between counsel, the conduct of the hearing was fair and impartial, and plaintiff was ably and effectively represented. We fail to find, as is required in order to reverse, that an opposite conclusion to that of the committee is clearly evident.

 Finally, we agree with plaintiff that administrative as well as judicial proceedings are governed by the requirement of due process of law (Italia America Shipping Corp. v. Nelson, 323 Ill 427, 154 NE 198 (1926)), and that the right to practice medicine is entitled to be so protected and secured.

 "In a proceeding so serious, due process of law requires a definite charge, adequate notice, and a full, fair and impartial hearing." (Smith v. Department of Registration & Education, 412 Ill 332, 344, 106 NE2d 722 (1952).) The findings of the committee "must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such." Fleming v. Illinois Commerce Commission, 388 Ill 138, 149, 57 NE2d 384 (1944).

We believe this record meets the foregoing tests and, therefore, the judgment of the Circuit Court affirming the order of the Department of Registration and Education was correct and is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.