In the Matter of MAINE CLEAN
FUELS, INC.

Supreme Judicial Court of Maine.

Oct. 17, 1973.

Jensen, Baird, Chapman & Gardner by Merton G. Henry, Portland, David E. Scoll, New York City, for Maine Clean Fuels, Inc.

E. Stephen Murray, John M. R. Paterson, and Lee M. Schepps, Asst. Attys. Gen., Augusta, for the Environmental Improvement Comm.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

ARCHIBALD, Justice.

By order of July 21, 1971, the Environmental Improvement Commission (EIC) denied the application of Maine Clean Fuels, Inc. (MCF), requesting approval of its proposed development of a petroleum refinery on Sears Island.[1] This is an appeal pursuant to 38 M.R.S.A. § 487 seeking judicial review of the EIC action. We deny the appeal.

Enactment of the Site Location of Development Law (SLL) (38 M.R.S.A. §§ 481–488) provided

"a flexible and practical means by which the State, acting through the Environmental Improvement Commission, in consultation with appropriate state agencies, may exercise the police power of the State to control the location of those developments substantially affecting local environment in order to insure that such developments will be located in a manner which will have a minimal adverse im-

I. We describe the location of Sears Island in relation to Penobscot Bay generally and, specifically, with reference to Searsport.

The Penobscot is one of Maine's three major rivers. It rises in the wooded areas of north central Maine and flows southward into the Atlantic Ocean. In its southward flow, and as it emerges from wilderness areas, it has attracted residential and industrial settlement, increasing in intensity as it approaches the ocean.

Penobscot Bay is well known for its many potentials, both commercial and recreational. Its westerly coast is well developed commercially (i. e., the poultry industry at Belfast and fish packing in Rockland). The easterly coast is less commercial but extends, as the bay widens, to Castine and Stonington. Penobscot Bay, per se, is Maine's largest, being a coastal cleavage in the approximate center of the State.

Sears Island, containing 945 acres, is approximately at the confluence of the Penobscot River with Penobscot Bay. North of the island the river is recognizable as such; southerly the river loses its identity as it merges with the Bay. The shore lines sweep apart both southeasterly and southwesterly. It is dispersed with several large islands which lie on one side or the other of shipping lanes. Isleboro, North Haven, Vinalhaven and Deer Isle are relatively large land areas and all contain many summer houses, as well as an established nucleus of permanent residences.

The Bay serves a diversity of interests. Fishermen of all types ply their trade in its waters. Coastal shipping, which includes oil tankers, find berths in Rockland, Belfast, Searsport and Bucksport. Camden harbor is famed as a home port for many types of pleasure craft. Sportsmen know the challenges of sailing in Eggemoggin Reach on the easterly side of the Bay. The "State of Maine," manned by midshipmen from the Maine Maritime Academy, leaves Castine annually on its training cruise. Lobstering, trawling and other means of fishing are prevalent along this coast.

Sears Island, connected to the mainland by a causeway, lies easterly of the town of Searsport, a municipality of about 2,000 inhabitants on the westerly shore of Penobscot Bay. There are presently located on the mainland numerous oil storage facilities which are supplied by coastal tankers and barges. Distribution therefrom is by truck, rail and pipe line.

pact on the natural environment of their surroundings."

38 M.R.S.A. § 481.

In accordance with the procedures established in Section 483, MCF notified the EIC of its intent to build an oil refinery and of the nature and location of the proposed development. The EIC determined that a public hearing thereon was necessary and caused public notice thereof to be given. The initial hearing commenced March 23, 1971, at Searsport.

Both the statutory criteria for approval of developments and the nature of the applicant's burden of proof were provided explicitly by the SLL then in effect:

"At such hearing the commission shall solicit and receive testimony to determine whether such development will in fact substantially affect the environment or pose a threat to the public's health, safety or general welfare.

The commission shall approve a development proposal whenever it finds that:

1. Financial capacity. The proposed development has the financial capacity and technical ability to meet state air and water pollution control standards, has made adequate provision for solid waste disposal, the control of offensive odors, and the securing and maintenance of sufficient and healthful water supplies.

2. Traffic movement. The proposed development has made adequate provision for loading, parking and traffic movement from the development area onto public roads.

3. No adverse affect [sic] on natural environment. The proposed development has made adequate provision for fitting itself harmoniously into the existing natural environment and will not adversely affect existing uses, scenic character, natural resources or property values in the municipality or in adjoining municipalities.

4. Soil types. The proposed development will be built on soil types which are suitable to the nature of the undertaking.

At hearings held under this section the burden shall be upon the person proposing the development to affirmatively demonstrate to the commission that *each of the criteria* for approval listed in the preceding paragraphs have been met, and that the public's health, safety and general welfare will be adequately protected." (Emphasis supplied.)

Pub.L.1969, ch. 571, § 484.

Likewise, the scope of this Court's review of the action taken by the EIC pursuant to the SLL is limited in unambiguous terms.

"Review shall be limited to the record of the hearing before and the order of the commission. The court shall decide whether the commission *acted regularly* and *within the scope of its authority,* and whether the order is supported by *substantial evidence,* and on the basis of such decision may enter judgment affirming or nullifying such determination." (Emphasis supplied.)

Pub.L.1969, ch. 571, § 487, now 38 M.R.S.A. § 487.

At the conclusion of the hearings, the EIC made forty-four findings of fact from which ten conclusions were drawn. On the basis of those findings and conclusions the commission determined that MCF had "failed to sustain its burden of proof" that the proposed development:

"1. Has the financial capacity and technical ability to meet State air and water pollution control standards;

2. Has made adequate provision for the securing and maintenance of sufficient water supplies;

3. Has made adequate provision for traffic movement from the development area onto public roads;

4. Has made adequate provision for fitting itself harmoniously into the existing natural environment and will not adversely affect existing uses, scenic character, natural resources or property values in the municipality or in adjoining municipalities.

5. Will adequately protect the public health, safety and general welfare."

■ It is clear from the language of Section 484 that successful applicants must affirmatively demonstrate compliance with each criterion therein and failure to do so as to *any one* of them constitutes a basis for denial of the application. Since we have previously held that these criteria are severable, In Re Spring Valley Development, 300 A.2d 736, 751 (Me.1973), it necessarily follows that if the Court is satisfied from the record of the hearing that the commission's decision as to any one of them is supported by substantial evidence, the EIC order must be affirmed.[2]

■ Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Edison Co. v. Labor Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Application of the substantial evidence standard of review requires the reviewing court to "search the entire record . . . to determine whether on the basis of all the testimony and exhibits before the agency it could

fairly and reasonably find the facts as it did." Braniff Airways, Incorporated v. C.A.B., 126 U.S.App.D.C. 399, 379 F.2d 453, 462 (1967). *See* Universal Camera Corp. v. National Labor Rel. Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). And, the fact that it is possible to draw "two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Thus the issue before this Court is not whether we would have reached the same conclusion but whether the record contains competent and substantial evidence which supports the result reached by the commission. As we noted earlier, because Section 484 places upon applicants the burden of proof as to each criterion, substantial evidence in support of any one of the EIC conclusions is decisive of this appeal.[3]

### I–A

We first deal with the challenged validity of the statute.

MCF advances several arguments based upon the erroneous premise that the SLL is the equivalent of a state-wide zoning statute. Appellant maintains that the SLL is invalid because it authorizes the exercise of zoning power without either a comprehensive plan or reasonable classifications.

2. Section 487 also directs this Court to "decide whether the commission acted regularly and within the scope of its authority . . . ." The appellant has not alleged that the EIC hearings were "irregular" in the sense that they amounted to arbitrary administrative action or an abuse of agency discretion, nor does MCF contend that the commission exceeded the scope of its authority or jurisdiction. Instead, any issues of administrative "impropriety" are raised by MCF as matters of administrative due process and are dealt with fully elsewhere herein. To the extent that administrative "regularity" is not implicitly a part of due process, we simply note here

that there is no indication that the EIC acted other than "regularly."

3. MCF asserts twelve separate points of appeal, six of which are essentially a challenge to the EIC fact finding process. Because of the nature of this Court's review of the EIC order, we treat these six points as one general objection, namely, that the EIC order was not supported by substantial evidence. The remaining points assert both the invalidity of the SLL, the composition of the commission thereunder, numerous procedural errors of the commission and its staff during the hearing, and the failure of the commission to meet the demands of administrative due process in the conduct of the hearing.

Although this Court has characterized the SLL as "in the nature of a zoning statute," [4] we have more recently held that the statute is clearly distinguishable from zoning laws, the only resemblance being "that both seek to restrict the use of land to areas appropriate for the purpose . . . ." In Re Spring Valley Development, 300 A.2d at 753. Unlike zoning laws, the

> "Site Location Law . . . is not directed toward promoting an orderly community growth . . . . It is not concerned with where a development takes place in general but only that the development takes place in a manner consistent with the needs of the public for a healthy environment. It did not grant the Commission the authority to determine where the location of a development must be but rather it gave the Commission authority to measure the proposal and location against statutory standards and to apply reasonable terms and conditions which the proposal must meet in order that it may be 'located in a manner which will have a minimal adverse impact on the natural environment.' "

*Id.* at 753–754.

Because of these basic distinctions between the Site Location Law and traditional zoning ordinances appellant's efforts to analogize the two must fail. The SLL was enacted to provide "the State with a means of minimizing, through the exercise of its police power, the irreparable damage being done to the environment." *Id.* at 746. There is no evidence that the legislature intended each EIC order or decision to fit within a broad comprehensive plan. *Id.* at 754. And, because the EIC does not function within the confines of a comprehensive, state-wide plan, MCF's contention that the EIC order amounted to "spot zoning in reverse" is without merit. In short, the legal prin-

ciples against which zoning ordinances are traditionally tested are inapposite to our consideration of the SLL. The appropriate legal standard to be applied to a police power measure is whether the means adopted by the legislature are rationally related to the purpose of the· enactment. State v. Union Oil Co. of Maine, 151 Me. 438, 447, 120 A.2d 708, 712 (1956). The Court held in *Spring Valley,* and reaffirms here, that the means and purpose of the SLL are so related.

### I–B

Maine Clean Fuels contends that the SLL fails to establish those clear and reasonable standards that are legally required before an administrative agency can be vested with the power of enforcement. Appellant specifically challenges the criteria established by Section 484 as impermissibly vague. Precisely the same attack was made on Section 484 in *Spring Valley* and was rejected by this Court. After discussing each of the criteria and its relationship to the purpose of the SLL, we concluded:

> "[T]he standards which the Act imposes upon the commission and the applicants are clear, explicit, rationally related to the purposes of the Act and are adequate guides for the conduct of both the Commission and the applicants."

300 A.2d at 752.

### I–C

Finally, appellant maintains that the EIC order limits the use of Sears Island to such an extent as to amount to a taking of property without just compensation. MCF concedes, as well it must (*see* 300 A.2d at 748), that private property is subject to reasonable regulation pursuant to the State's police power but argues that in the present case the EIC order is so restrictive as to constitute an arbitrary taking. Unlike the situation in State v. Johnson, 265 A.2d 711 (Me.1970), in the record

---

4. King Resources Co. v. Environmental Improve. Com'n, 270 A.2d 863, 868 (Me.1973).

before us there is no evidence relative to the "extent of the diminution" in value of Sears Island to its owners [5] resulting from the EIC order. *See* Penna. Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Absent a showing that the EIC order resulted in "such an unreasonable burden upon the property as would equal an uncompensated taking," 300 A.2d at 749, MCF's argument is not cognizable by this Court.[6]

## II-A

The appellant challenges the order of the EIC as being procedurally vulnerable for reasons of due process. First, MCF argues that the procedural rules of the EIC are, themselves, violative of administrative due process. Secondly, it is urged that, even if the rules themselves are valid, the EIC did not abide by them, thus depriving MCF of due process in the conduct of the hearing.[7]

We consider the rules as promulgated.

On February 19, 1971, the EIC, pursuant to statutory authority, adopted "Procedures for the conduct of Hearings." Pub.L. 1969, ch. 571, § 2. These published rules provided in part:

III. *Order of Testimony*

Witnesses will be heard in the following order:

A.  Applicant   and   representatives

.   .   .   .

B.  Commission Staff Members (Staff members will testify only if they have facts not in the record.)

C.  Proponents

D.  Opponents

E.  All others

IV.  *Questioning of Witnesses*

At the conclusion of the testimony of each witness, first the EIC Commissioners and Staff, second the applicant and third all others will be given the opportunity to question the witness through the Chairman, and to make statements of fact in opposition to or in explanation of any factual statements of the witness.

VIII.  *Continuances and Leaving the Recond Open.*

.   .   .   .   .   .

At the conclusion of the hearing, the Chairman may allow a reasonable period of time within which time additional evidence in written form may be submitted by any party for inclusion in the record and an equal amount of time thereafter for written statements in rebuttal of any such evidence for inclusion in the record. All evidence submitted  .  .  .  will be available for public inspection  .  .  .  .

On the opening day of the hearing, March 23, 1971, the Chairman, acting pursuant to these rules, described "in general terms, the manner in which the hearing [would] be conducted." On April 12, 1971, the last regularly scheduled hearing was recessed to be reconvened on May 21, 1971. From April 12 until May 14 the record was left open for submission of documentary evidence by any party. In the final week of the recess, May 14 to May 21, only evidence in rebuttal to the additional

---

5.  In reality Sears Island is owned by the Bangor and Aroostook Railroad Company. It apparently was understood between this company and MCF that if approval for the construction of the refinery was obtained, the right to use Sears Island for this purpose would be formalized.

6.  In *Johnson*, a case relied upon heavily by appellants, the Court found that the restrictions imposed by the Wetlands Control Board left the appellants "with commercially

valueless land." 265 A.2d at 716. Thus, the "extent of the diminution" in value of the Johnson property was factually established to the satisfaction of the Court to be *total*, at least in a commercial sense.

7.  In this latter context, MCF points specifically to a change in the manner in which the EIC staff was to present its material, which was contrary to the announced order of presentation made by the Chairman when the hearing was originally convened on March 23, 1971.

documentary evidence was received for the record. On May 21, 1971, the hearing was reconvened as scheduled for the purpose of formally entering all supplemental documentary evidence into the record. The hearing was then again recessed until June 11, 1971, to allow "[a]ll parties . . . to submit final testimony and evidence" in rebuttal to the rebuttal evidence received on May 21, 1971. At that final session on June 11, 1971, the commission, in addition to receiving "suggested findings of fact and any closing arguments by way of brief," reserved the right to finally question certain witnesses.

■ It is a generally accepted principle of administrative law that administrative agencies, at least in the absence of "specific legislative direction," Laba v. Newark Board of Education, 23 N.J. 364, 129 A.2d 273 (1957), "should be free to fashion their own rules of procedure." Federal Comm'n v. Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940); In Re Shelton College, 109 N.J.Super. 488, 263 A.2d 810, 812 (1970). Within the bounds of "fair play," administrative agencies have the power, either impliedly, In Re 17 Club, 26 N.J.Super. 43, 97 A.2d 171, 173 (1953), or, as in the present case, statutorily conferred, Pub.L.1969, ch. 571, § 2, to adopt rules of practice and procedure relative to the conduct of agency proceedings.

The wisdom of liberal rule making power is illustrated by the record in the case before us. If the evidentiary rules commonly accepted as applicable to formal court proceedings governed the conduct of administrative hearings, we doubt that the legislative purposes of such acts as the SLL could be effectuated without unreasonable expenditures of both time and money. The record before us is voluminous. The testimonial transcript comprises 1664 pages, exclusive of the pleadings, docket entries, record of intent, addenda thereto and exhibits which in themselves, by estimate, would total 800 pages. The actual hearings at the Searsport District

High School and the Belfast Armory lasted six days. The use of sound discretion by the agency is necessary so that the ultimate record will contain a factual basis for the administrative action required by the SLL.

■ We have read the promulgated rules carefully and we fail to see where, in the context of an administrative agency such as the SLL, these rules exceed the bounds of fair play.

■ In the present case, the actual procedures followed at the hearing were in substantial accordance with these rules. Any variation from the original rules was so slight as to be inconsequential and, absent some showing of prejudice, cannot be considered a denial of administrative due process. As a matter of law, "[t]he ad hoc process of development of administrative procedures is not an improper one." Sun Oil Company v. Federal Power Commission, 256 F.2d 233, 239 (5th Cir. 1958). Indeed, inherent within the power of an administrative agency to prescribe its own rules of procedure is the power to alter those rules when necessary or helpful to the achievement of the agency's objectives. Such flexibility and adaptability, when exercised fairly, is essential to an effective administrative response to a complex regulatory task. See Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953). To reiterate, relaxation or modification of procedural rules by an administrative agency does not constitute reversible error absent "a showing of injury or substantial prejudice." Sun Oil Company v. Federal Power Commission, 5 Cir., 256 F.2d at 239.

■ Appellant's sole specification of prejudice relates to the final hearing session on June 12, 1971. On that day a letter written by a Mr. Rand was entered into the record as rebuttal evidence regarding the number of borings necessary for a proper evaluation of the soil and bedrock conditions on Sears Island. Under questioning by the commission, Mr. Rand testi-

fied that, in his opinion, the three borings conducted by MCF on the island were inadequate to test such conditions properly. The appellant argues that the procedures then in effect prevented MCF from rebutting this testimony and resulted in prejudice to the appellant.

We find no merit in this argument. First, the record reveals that MCF had "agreed to the scheme of filing" evidence at the June 12, 1971 session. The necessity of this restriction on the receipt of evidence is obvious. As counsel for MCF acknowledged while entering his objection, "this gets into the point of rebuttal and rebuttal and rebuttal, a la Gertrude Stein . . . ." Secondly, the substance of Mr. Rand's testimony had already been made a part of the record by the introduction of his letter into evidence. Since MCF's general objection to the procedures adopted for the purpose of finally closing the record is groundless and must fail, we are unable to understand how Mr. Rand's testimony, which was never specifically objected to, has prejudiced appellant's case. It seems to us to be implicit in the evidence presented by MCF that, in the opinion of their experts, three borings are sufficient to evalute the conditions on Sears Island. Thus, in the broadest sense, MCF's previous evidence contradicted Mr. Rand's testimony and further expert opinion on the issue at this stage of the hearing would add little to the record.

Although appellant does not specify exactly how the hearing procedures relative to "presentation of material by the staff" were modified to their prejudice, we assume that the objection is to the practice of allowing the staff members to introduce evidence after all other participants have presented their evidence. This rule, which was first established by the Chairman in his opening remarks on March 23, 1971, is admittedly at odds with the strict letter of the rules promulgated on February 19, 1971. However, we feel the new rule is in keeping with both the spirit of the original rules and the function of the commission staff. It is apparent from both the original rules and from the Chairman's opening statement that a primary function of the staff members was to insure that the final record of the hearing was complete and that all pertinent facts were entered into evidence. In view of this complementary function, it seems eminently sensible for the staff to proceed with the introduction of such additional evidence only after all other participants have finished.

Again, appellant has made no showing that this slight modification of the hearing procedures worked to its prejudice. In terms of the ultimate record produced by the hearings, we fail to see the significance of the order in which evidence is introduced. This is especially so in view of the fact that the appellant had ample opportunity to rebut any evidence presented, including that introduced by the commission staff. We have been unable to discover any authority, nor has appellant specified any, for the proposition that changing the order of presentation of evidence before an administrative tribunal is violative of due process. *See* California Lumbermen's Council v. Federal Trade Com'n, 115 F.2d 178, 182 (9th Cir. 1940).

II–B

At the beginning of the hearing the Chairman of the EIC set forth the procedures by which the hearing would be conducted. One of the rules was that:

"Questions may be asked from the floor of any witness, but all questions should be written and will be asked through the chair."

Appellant's basic contention is that this procedure so restricted the right of cross-examination as to amount to a denial of administrative due process; that cross-examination by way of written questions was so cumbersome as to render it ineffective for purposes of discrediting adverse testimony.

Perhaps the only sound generalization that can be made regarding due process is that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Rest. Wkrs. U., Local 473 v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Thus the right to cross-examine witnesses, a fundamental right in criminal proceedings, has not yet attained the status of an absolute universally guaranteed requirement in administrative proceedings.[8] Origet v. Hedden, 155 U.S. 228, 237–238, 15 S.Ct. 92, 39 L.Ed. 130 (1894).

Although administrative agencies are constitutionally required to adhere to the "fundamentals of fair play," Federal Comm'n v. Broadcasting Co., 309 U.S. at 143, 60 S.Ct. 437, the courts have been reluctant to impose rigid procedural requirements upon administrative proceedings. The basic difference in "origin and function" of our judicial and administrative systems "preclude[s] wholesale transplantation of the rules of procedure trial and review which have evolved from the history and experience of courts" to the administrative process, and administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." 309 U.S. at 143, 60 S.Ct. at 441, Interstate Commerce Commission v. Baird, 194 U.S. 25, 44 (1904). Thus the minimal requirements of administrative "fair play," something less than that demanded of our courts but something more than unfettered administrative action, are to be determined "from case to case in accordance with differing circumstances." Federal Communications Com'n v. WJR, The Goodwill Sta., 337 U.S. 265, 276, 69 S.Ct. 1097, 1103, 93 L.Ed. 1353 (1949).

"Whether the Constitution requires that a *particular right* obtain in a *specific proceeding* depends upon . . . the nature .of the proceeding, and the possible *burden* on that proceeding . . ." (Emphasis supplied.)

Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960).

The "particular right" asserted by appellant is the right to cross-examine witnesses orally. Inasmuch as cross-examination was available by way of written questions submitted through the chair, the actual thrust of appellant's argument can only be that the *effectiveness* of the available means of cross-examination was so impaired as to render it useless. In other words, appellant does not contend that he was denied the right to cross-examine witnesses but that the manner in which he was required to exercise that right was restricted to such an extent as to constitute a denial of due process.

The right to confront and cross-examine adverse witnesses is constitutionally required in "almost every setting where important decisions turn on questions of fact." Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Int. Com. Comm. v. Louis. & Nash. R.R., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913). Indeed, the highest courts of many states consider the right of cross-examination to be an inherent, basic element of due process. Application of Plainfield-Union Water Co., 11 N.J. 382, 94 A.2d 673, 677–678 (1953); In Re Shenandoah Suburban Bus Lines, 355 Pa. 521, 50 A.2d 301, 305 (1947); Wadell v. Board of Zoning Appeals, 136 Conn. 1, 68 A.2d 152, 155–156 (1949).

However, there are instances where, under the particular circumstances of the

---

8. Indeed, even in criminal proceedings "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973).

case, courts have held that even totally precluding cross-examination was not violative of due process. Origet v. Hedden, *supra. See* n. 8, *supra*. Where the administrative process could be characterized as quasi-legislative,[9] or investigative,[10] due process has been found not to require cross-examination. And in Roy v. Water Supply and Pollution Control Com'n, 289 A.2d 650 (N.H.1972), the New Hampshire Supreme Court concluded that denial of the right to cross-examine witnesses at a commission hearing, a quasi-adjudicatory proceeding, did not violate due process because the agency decision was based largely on its own expertise and "cross-examination [did] not appear necessary for a full disclosure of the facts . . . ." *Id.* at 654. The lesson of these cases for our purposes is that, as the Supreme Court has made clear, what due process requires depends primarily upon "the nature of the [specific] proceeding, and the possible burden on that proceeding." *Hannah,* 363 U.S. at 442, 80 S.Ct. at 1515.

■ At hearings conducted by the EIC, the commission, pursuant to the mandate of Section 484, "shall solicit and receive testimony" as to whether a proposed development will "substantially affect the environment or pose a threat to the public's health, safety or general welfare." The applicant's burden is to demonstrate affirmatively that no such effect or threat will result from the development and that each of the criteria specified in § 484 have been met.

9. Rivera v. Division of Industrial Welfare, 265 Cal.App.2d 576, 71 Cal.Rptr. 739, 750–751 (1968); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 303–308, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

10. Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 93 L.Ed. 1353 (1960).

11. We simply note here that the EIC's functions could be characterized in various ways: quasi-judicial in that the EIC must ultimately determine whether the applicant has sustained his burden of proof; quasi-legislative in that the EIC may grant permission to an applicant

The commission's function in the broadest sense is that of a regulatory body.[11] The EIC is charged with the responsibility of regulating "the location of developments which may substantially affect environment" (§ 481) by insuring that those developments falling within the scope of the Site Location Law (§ 482) "will have a minimal adverse impact on the natural environment." (§ 481).

■ It seems that the type of hearing envisioned by the legislature is significantly broader in scope and character than the "everyday" administrative proceeding. Rather than an administrative hearing involving narrow factual issues and a limited number of parties the EIC hearings are intended to be public in nature, in terms of participation as well as observation. The notice of public hearing published by the EIC invited "(a)11 interested persons . . . to attend and give such information, including testimony . . . as may be of assistance to the commission . . . ." This invitation and the widespread publicity given the hearing attracted, as expected, large numbers of interested citizens.[12]

■ Within this specific administrative setting, taking into consideration

"the nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding"

*(Hannah, supra),* the basic due process issue is relatively narrow: Does the poten-

"upon such terms and conditions" as it deems advisable; and investigative in that the commission is directed by statute to "solicit . . . testimony" generally regarding the environmental impact of a proposed development.

12. In his opening statement the chairman of the EIC implored those present to restrict their testimony to the factual issues presented. "(E)motional appeals are of limited help" since the ultimate decision must be "based upon consideration of relevant facts as reflected in the record—not on a plebiscite of personal prejudices."

tial burden of unrestricted oral cross-examination of witnesses at a public hearing of this nature justify the limitation of cross-examination to written questions submitted through the chair? We conclude that it does.

The various procedural ground-rules established at the outset of the hearing were obviously intended to help maintain some degree of orderliness and efficiency at the hearing itself and, just as importantly, to insure that the resulting transcript of the hearing be of manageable proportions. An undeniable effect of requiring that questions of witnesses be in writing would be to discourage superfluous and irrelevant questioning while conversely insuring, to a substantial degree at least, that those questions ultimately asked were carefully considered and had a direct bearing on the material factual issues before the commission.

This is not to say, of course, that the right of oral cross-examination should be restricted or entirely precluded as a matter of course. We are fully aware of the advantages of oral cross-examination of an adverse witness; for us to insist that written cross-examination is as effective would be sheer folly. But, under the circumstances we feel that any tactical advantage lost to the applicant was recovered to a large extent by the commission's rule permitting the applicant to file rebuttal evidence.

We note that the appellant has failed to point out, even arguendo, any specific instance where unrestricted oral cross-examination would have been more effective than the procedure actually utilized. The prejudice claimed is *theoretical* only and, if none results *in fact* we conclude that no error was committed.

### III

During the course of the hearings the commission admitted into the record a wide variety of documents submitted by the various participants, including commission staff members.[13] Occasional objections to the admissibility of such documents were taken under consideration by the commission for later disposition. The record does not show that any rulings were ever made by the commission, either admitting or excluding these exhibits.

Appellant contends that the wholesale admission into evidence of such documents without regard to relevance, materiality or authenticity was error. The thrust of MCF's argument seems to be that the EIC was obligated "to exercise discretion in accepting documents in bulk"; that at some point the committee was required to render judgment as to the legal competence of each individual document.

■ This argument disregards the basic differences, noted earlier, in our judicial and administrative systems and miscomprehends this Court's role in reviewing decisions of the EIC. It is a widely accepted proposition that the highly technical rules of evidence are not, and should not, be applicable to administrative proceedings.

> "The common law exclusionary rules of evidence are not based in Constitutional interdictions and are not applicable to administrative proceedings, even of judicial character, in the absence of statutory requirement . . . .
>
> .   .   .   .   .   .
>
> Thus the *receipt* of . . . evidence, over objection, and even if "immaterial, irrelevant," etc., is not such a grievous error as to require reversal. The receipt of irrelevant, immaterial and hearsay evidence is no cause for reversal of an administrative order though the validity of the order can never rest upon conjecture, guess or chance."

Willapoint Oysters v. Ewing, 174 F.2d 676, 690 (9th Cir. 1949); *accord* Portland Pipe

---

13. There were 321 exhibits included in the record, some of which contained several included documents sub-titled A–B–C, etc.

MCF's objection is directed at 71 of these exhibits.

Line Corp. v. Environmental Imp. Comm., 307 A.2d 1 (Me.1973); Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 1015 (1930).

▮▮▮ The fact that the EIC may have admitted into the record documents that would constitute incompetent evidence in a court of law does not alone compel reversal of the commission decision. The evidentiary standard to be applied by this Court in reviewing decisions of the EIC is "whether the order is supported by substantial evidence." 38 M.R.S.A. § 487. Proper application of this standard requires this Court

> "to search the entire record . . . to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did."

Braniff Airways, Incorporated v. C.A.B., 126 U.S.App.D.C. 399, 379 F.2d 453, 462 (1967). When that review of the record reveals reliable, probative evidence in support of the agency findings and conclusions, the fact that irrelevant or incompetent evidence was admitted by the commission does not amount to reversible error. Sisto v. Civil Aeronautics Board, 86 U.S. App.D.C. 31, 179 F.2d 47, 51 (1949). Only when the agency is shown to have relied upon incompetent evidence to the prejudice of the complaining party can the admission of such evidence require reversal of the agency decision.[14] *Id.* at 51; Schyman v. Department of Registration & Education, 9 Ill.App.2d 504, 133 N.E.2d 551 (1956).

▮▮▮ If we assume that many so-called exhibits were irrelevant (and a review of some of these documents would support this assumption), the question is whether they played any role in the ultimate decision of the EIC. Otherwise stated, we must inquire whether the decision is supported by substantial evidence which, in the context of an administrative hearing, is relevant and material. *See* Tagg Bros., 280 U.S. at 442, 50 S.Ct. 220. As will be noted, *infra,* we conclude that such was the case. Therefore, absent a showing of prejudice (there being none demonstrated here), it is not reversible error to either admit such documents or to fail to make an ultimate ruling on their admissibility. *Schyman, supra,* 133 N.E.2d at 561–562.

### IV–A

▮▮▮ Appellant challenges the composition of the EIC. It contends that this composition "deprived [it] of an unbiased and independent trier of facts and is a denial of due process." In support of this contention MCF has argued that the lack of clear statutory standards limiting the

---

14. Not only is this general relaxation of the rules of admissibility legally permissible but, by many leading authorities, it is considered to be the more practical and efficient approach. In reference to a dispute over the admissibility of evidence before a Federal Trade Commission examiner, one distinguished court observed:

> "Why either [party] should have thought it desirable to be so formal about the admission of evidence, we cannot understand. . . . [I]t is better, nine times out of ten, to admit, than to exclude, evidence and in such proceedings as these the only conceivable interest that can suffer by admitting any evidence is the time lost, which is seldom as much as that inevitably lost by idle bickering about irrelevancy or incompetence."

Samuel H. Moss, Inc., v. Federal Trade Commission, 148 F.2d 378, 380 (2d Cir. 1945). In National Labor Relations Board v. Remington Rand, Inc., 94 F.2d 862, 873 (2d Cir. 1938), Judge Learned Hand suggested as a general standard of admissibility that evidence be of the kind "on which responsible persons are accustomed to rely in serious affairs." *See* 5 M.R.S.A. § 2405 (1) which, in establishing rules of evidence for administrative hearings by the "Hearing Commissioner," provides: "When necessary to ascertain facts not reasonably susceptible of proof under those rules [trial of civil cases] evidence which is not ordinarily admissible may be admitted . . . if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." *Portland Pipe Line Corp.,* 307 A.2d at 14.

exercise of power by the commission, combined with the "special interests" of the membership thereon, leads to the conclusion that the EIC "can be expected to exe·cise [its power] arbitrarily." We find no merit in this position.

Pub.L.1969, ch. 499, § 1 provided that the EIC shall consist of

"10 members appointed by the Governor with the advice and consent of the Council, 2 of whom shall represent manufacturing interests of the State, 2 of whom shall be representatives of municipalities, 2 of whom shall represent the public generally, 2 of whom shall represent the conservation interests in the State and 2 other members knowledgeable in matters relating to air pollution."

The decision in *Spring Valley* and our previous holding herein have established that the first premise of this argument, namely, that Section 484 is lacking in the minimum legally required standards, is false.

The second premise is that five criteria established under the statute for membership in the EIC created a "built-in" opportunity for the arbitrary exercise of power.

■ It is an established concept of administrative law that a state legislature has the right, absent some unique constitutional prohibition, to determine the qualifications of those who are appointed to hold administrative offices. Kachian v. Optometry Examining Board, 44 Wis.2d 1, 170 N.W. 2d 743 (1969); Continental Ill. N. B. & T. Co. v. Illinois St. T. Hy. Com'n, 42 Ill.2d 385, 251 N.E.2d 253 (1969); 73 C.J.S. Pub-

lic Administrative Bodies and Procedure, § 11 at 308; *See also* Groves v. Board of Education, 367 Ill. 91, 10 N.E.2d 403 (1937).

■ The corollary to this concept is that the qualifications for holding administrative office fixed by the legislature cannot be arbitrary, but considering the function and duties entailed in carrying out the purposes of the agency they must meet the test of reasonableness. State v. Marsh, 141 Neb. 436, 3 N.W.2d 892 (Neb.1942); *see also* 73 C.J.S. Public Administrative Bodies and Procedure, *supra*; People v. Wood, 391 Ill. 237, 62 N.E.2d 809 (1945).

■ The composition of the EIC is necessarily broadly based because we deem the legislature found it reasonable that many factors would necessarily have to be considered in regulating the location of any development. It is obvious that local environment has many aspects and a judgment carrying out the legislative mandate that developments will be allowed only if they have "a minimal adverse impact" thereon requires the exercise of a broadly based judgment. It seems clear to us that the legislature considered a variety of interests which it felt could best make the important decisions delegated to this commission. Its conclusion that the five types of interests delineated in the statute could best serve the public is completely reasonable.[15]

■ Appellant's assertion of compositional prejudice is far too general and vague to overcome the presumption of regularity which we must give to legislative enactments. The fact that the EIC is not a court and that its commissioners are not

---

15. For illustration note the composition of other commissions:

7 M.R.S.A. § 2952, Maine Milk Commission, composed of "3 producers, one of whom shall be a producer shipping to Boston Federal Order, a dealer, a producer-dealer, and 2 consumers."

26 M.R.S.A. § 1081, Maine Employment Security Commission composed of "3 members, one of whom shall be a representative of labor, one of whom shall be a rep-

resentative of employers, and the Commissioner of Manpower Affairs."

39 M.R.S.A. § 91, Industrial Accident Commission, composed of "6 members, 4 of whom shall be men learned in the law and members in good standing of the bar of this State."

20 M.R.S.A. § 51, State Board of Education, composed of 9 members "broadly representative of the public."

judges does not significantly alter our approach. The commission's membership composition, procedures and duties are legislatively mandated. Thus the Court, until shown otherwise, must assume that the commissioners, like judges, are "men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

Moreover, appellant overlooks the fact that

"a distinction must be made between a preconceived point of view about certain principles of law or a predisposed view about the public or economic policies which should be controlling and a prejudgment concerning issues of fact in a particular case."

New Hampshire Milk Dealers Association v. New Hampshire Milk Control Board, 107 N.H. 335, 222 A.2d 194, 198 (1966). An interest of the nature necessary to disqualify one acting in an adjudicatory capacity must be more than a general philosophical, political or social inclination. It must be "direct, definite, and capable of demonstration; not remote, uncertain, contingent or unsubstantial, or merely speculative or theoretic." [16] Selectmen of Andover v. County Commissioners, 86 Me. 185, 188, 29 A. 982, 983 (1893); See 2 Am.Jur.2d Administrative Law, § 64.

We hold that the composition of the EIC is valid.

### IV–B

■ MCF's only allegation of prejudice, which it urges should void the order, relates to the giving of two press interviews. In one of these the director of the oil pollution department of the EIC was reported as having said that, in the estima-

tion of the Army Corps of Engineers, the dredging project proposed by MCF for Penobscot Bay would take ten years. The article pointed out that MCF had indicated repeatedly that it contemplated a building program of three to four years. In another reported interview an unnamed member of the commission was quoted as characterizing MCF's "Record of Intent" as "vague, not specific, and full of public relations copy, rather than technical data."

These reported interviews fall far short of demonstrating prejudice of the nature necessary to require nullification of the EIC decision. The first shows only that the Army Corps of Engineers and MCF apparently were in disagreement as to the period of time necessary to complete the dredging of Penobscot Bay. The other established only that an unidentified commissioner was something less than impressed with MCF's "Record of Intent." Neither article indicates a *pre-judgment* as to the factual issues to be decided by the EIC. Presumably each commissioner must, at some time after reviewing the Record of Intent filed by MCF, reach a conclusion as to its adequacy in relation to the site location hearings. The fact that one commissioner did so do, and then expressed his opinion in a newspaper interview, in no way disqualifies him individually (or the commission as a whole) from exercising his duties as a commissioner. United States v. Morgan, 313 U.S. at 421, 61 S.Ct. 999. In the absence of any direct, demonstrable evidence of prejudice, we are compelled to conclude that appellant's allegations are without foundation.

### V

Our holding to this point has rejected the arguments of MCF that:

1. The SLL is unconstitutional.

2. The SLL is constitutionally lacking in standards.

---

16. One commissioner, because of financial interest, voluntarily disqualified himself from participating in the hearing. This was proper since a common law duty of dis-
qualification for financial interest exists absent any statutory mandate. Kachian v. Optometry Examining Board, 44 Wis.2d 1, 170 N.W.2d at 749.

3. The impact of the decision of the EIC amounts to an unconstitutional taking of Sears Island.

4. The procedural rules adopted by the EIC and its application of them to the instant hearing, including the limitation on cross-examination, violates the concepts of administrative due process.

5. Reversible error has been demonstrated because certain exhibits were allowed in the record without definitive rulings on their admissibility.

6. The statutory composition of the membership of the EIC is such that it amounts to a denial of due process.

7. MCF has demonstrated such a prejudice as would necessitate a reversal of the EIC decision because a staff member and a commissioner consented to newspaper interviews.

## VI

Having held that the EIC *acted regularly* and *within the scope of its authority,* we must next review the order to determine if it is *supported by substantial evidence.* 38 M.R.S.A. § 487. It must be recalled that, as we have already pointed out, MCF had the burden of proving its capacity to meet *each* criterion specified in Section 484 and that the failure to do so with respect to *any one* of these is fatal to the application for the license.

## VI–A

■ One of the criteria specified in Section 484(1) is that a development proposal must demonstrate "adequate provision for . . . the securing and maintenance of sufficient and healthful water supplies." The EIC found that MCF had failed in this respect. Was this finding supported by "substantial evidence"?

Mr. Martin Barry, an engineer associated with MCF as a consultant in the area of project management, testified that the record of intent filed with the EIC called for a water supply of 2,500 to 5,000 gallons per minute (GPM). More specifically, it was the testimony of Mr. Barry that a plant of the type proposed normally requires 2,500 GPM and that it was prudent "to seek availability of something in the order of fifty to a hundred percent over . . . normal anticipated requirement(s)."

The record of intent states that "[a]dequate underground sources of water exist in the Mosquito Mountain area, north of Sears Island. These will require development for additional supply capacity over that presently installed, which consists of two wells each of 600 GPM capacity."

John R. Rand, a registered professional geologist, and former state geologist in Maine, with twenty-two years experience since his graduation from Harvard "with honors in geological sciences," testified in opposition to the MCF application. In the opinion of Mr. Rand, the record of intent prepared by MCF was self-contradictory as to the necessary amount of water required to operate the proposed refinery. But, more importantly, his testimony raised serious questions as to the adequacy of water supplies in the area generally. Having located the two wells at Mosquito Mountain, and having spent some time analyzing them, Mr. Rand testified that the test by which their combined output of 1,200 GPM was determined was "completely inadequate . . . to determine the true yield capacity of the wells." During the test it was reported that the water levels in the wells was lowered by two to three inches, suggesting to Mr. Rand that the reservoir "was being depleted and was not capable of delivering 1,200 gallons in continuous extended pumping." Nor could the supply be increased by planting more wells.

Rand also expressed concern that MCF might, by over-pumping at the two wells at Mosquito Mountain, adversely affect future domestic use of water in the area.

This could occur by causing the nearby Penobscot River, the bottom of the wells being "ten to twenty feet below sea level," to "break through into the gravel [at Mosquito Mountain] and flow to the wells." Because of the low quality of that water the "source of fresh potable water would be destroyed for any future domestic or light industrial use."

Rand concluded that in his opinion

"the proposed facility cannot secure any practical source or sources of sufficient ground water in the area for the purposes they have stated, and that is on the order of 2400 to 3600 gallons per minute."

MCF responded by conceding "that the Mosquito Mountain Area underground source may not be capable of furnishing this incremental quantity of fresh water in addition to present local usage." MCF's solution was to propose three alternate sources:

1. Sea water desalinization facilities capable of producing sufficient quantities of fresh water so that the refinery would not have to depend on local sources.

2. Replace the evaporative fresh water cooling tower with a sea water cooling circuit, thereby eliminating the 1600 GPM fresh water demand of the original plan (cooling tower).

3. Arrangements with the Searsport Water District to provide part of the fresh water requirements.

The decision as to which of these alternatives to employ, or in what combination, would be made by MCF during "the final design phase."

Rand responded to the alternatives proposed by MCF by way of a letter which was subsequently made a part of the record. In that letter he did not deal specifically with the viability of either a de-

salinization plant or the use of a sea water cooling circuit, but did proceed on the assumption that the use of sea water cooling in the refinery process would, as contended by MCF, reduce total fresh water needs to 700 GPM. On the basis of topographic analysis of the watershed involved, it was his contention that it was unlikely that the Searsport Water District would be able to "capture even as much as 350 GPM in this area."

The commission made three findings of fact directly relating to the matter of adequacy of water supplies, two of which are pertinent here: [17]

"12. In his original application the applicant proposed to obtain needed process and cooling water from sources at Mosquito Mountain in the amount of 2300 gallons per minute. The water supply at Mosquito Mountain is not adequate to provide the needed cooling and process water to the proposed development without significant damage to, or depletion of, area groundwater supplies beyond the limits of property owned or controlled by the applicant.

13. Alternative water supplies were subsequently proposed by the applicant. Information submitted was insufficient to determine whether such alternate sources would have any detrimental effect on existing uses of fresh water in the vicinity of the proposed development. Further, the three alternatives were insufficiently documented as to feasibility and no choice among them was indicated."

From these findings the commission determined that the "applicant has failed to sustain its burden of proof [that it has] made adequate provision for the securing and maintenance of sufficient water supplies."

We conclude that the EIC result was supported by substantial evidence. The

17. Finding number 11 related to healthfulness of the available water supply and was favorable to appellant.

substance of finding number 12, namely, that the Mosquito Mountain water source was inadequate, was basically conceded by MCF. The thrust of finding number 13 was simply that various aspects of the three alternative sources proposed by MCF were insufficiently documented to enable the commission to reach a reasoned decision. One of the proposals, arrangements with the water district for supplying 700 GPM, was questioned sharply by Mr. Rand; the other two proposals, a desalinization plant and the use of a sea water cooling process, were bald proposals unsupported by evidence regarding their technical or economic feasibility.

From this state of facts, it seems clear to us that the commission was justified in concluding that MCF had failed to show affirmatively that it had made adequate provision for "the securing and maintenance of sufficient . . . water supplies." Absent some evidence, hopefully more persuasive then three undocumented alternate proposals, the commission could only conclude that the applicant had not sustained its burden of proof. Bearing in mind that the EIC is the fact finder and that the Court has no right to substitute its judgment on the facts for that of the EIC, we cannot say that this decision was erroneous.

### VI–B

While it might be sufficient for strict legal purposes to end our discussion at this point (since we have held that failure to prove each of the criteria of Section 484 is fatal to an application), we deem it proper to point out that the decision of the EIC finds additional support in the record beyond that already indicated.

The commission determined that MCF had failed to sustain its burden of proof regarding the "financial capacity and technical ability to meet State air and water pollution control standards." Unlike the EIC determination as to adequacy of water supplies (in which case there was a considerable amount of direct testimony offered),

this determination was largely inferential in the sense that specific and direct evidence was minimal.

Two findings of fact are pertinent:

"4. The record itself does not indicate, and in fact there is conflicting data from the applicant itself, whether the applicant properly estimated the costs which may be necessary for the construction of the development. Insufficient data was presented by the applicant as to the costs which would be allocated to required excavation and dredging, the development of additional water supplies, overcoming of soils limitations, and compliance with conditions necessary to safeguard the environment. No estimates were made by the applicant as to whether such costs would significantly increase the total cost of the development or, in fact, be economically feasible.

5. The applicant does not have its own financial resources to adequately fund the project as proposed and only has a general commitment from Kuhn Loeb Company to assist the applicant in obtaining financing if subsequent studies to be conducted by the applicant and Kuhn Loeb Company indicate the economic feasibility of the project."

From these findings the commission concluded:

"1. That the cost of the development may be substantially in excess of the applicant's estimate and that consequently the necessary funds may not be available to assure that all proffered environmental controls would be installed in the proposed development."

One of the four stockholders of Fuel Desulphurization, Inc., the parent company and sole owner of MCF, testified that the net worth of the two companies was something less than ten million dollars. In response to a question dealing with the prospect of raising "in excess of $150,000,000 or $200,000,000," this witness responded:

"It is a job, but that is the way these things are always done. Of course it is a job."

Relating the financial capacity to meet air and water pollution control standards to total project cost, the testimony of the investment banker responsible for obtaining the necessary project financing is illuminating.

"The only direct way to answer that is by an indirect answer. That is to say that the requirements that you will impose for the plant installation is part of the total project. You don't finance the pollution abatement division separately; you finance the entire project. Now, this, as far as we are concerned from the banking point of view, is like the dynamo or the generator or anything else that has to go in the plant to make an operable plant. *So if the plant in its entirety is feasible, including the pollution equipment, then obviously the pollution equipment will be financed.*" (Emphasis supplied.)

It was also clear from this banker's testimony that not only was there no formal contractual relationship with MCF for project financing but, additionally, the banking house itself had not, as of the hearing date, concluded its studies regarding economic feasibility.

Testimony at the hearing also questioned the accuracy of MCF's cost estimates for the refinery project. For instance, the initial estimate of a total investment of $150,000,000 apparently did not take into consideration the necessary dredging of Penobscot Bay. The project manager for MCF acknowledged at the hearing that there were no detailed plans for this dredging and estimated that such dredging would cost "on the order of five to ten million dollars," but later testified that because of the uncertainty of these costs the total cost for the project could result in a

difference of "50 million roughly." An engineer and EIC staff member calculated that the dredging necessary under MCF's plan would cost a minimum of 54 million or about one-third of the total cost of the project.

It is justifiable to infer from the testimony above that MCF was unable to finance the refinery itself, that it had no firm financing commitment to do so, and that its cost estimates, in some instances at least, were either inaccurate or speculative. In short, the financing plans and arrangements existing at the date of the hearing were tentative at best.

The particular question before the commission at this point was not the adequacy of financial plans in general but whether MCF had shown affirmatively that it had the "financial capacity . . . to meet State air and water pollution control standards."

However, it is clear that the ability to finance the cost of meeting pollution standards was inexorably a part of the ability of MCF to obtain total financing. In view of the fact that the SLL places upon MCF the affirmative burden of showing that it has the necessary financial capacity to comply with the statutory criteria, we must conclude that the decision of the EIC in this respect is supported by the record. Indeed, because of the scarcity of evidence directly relevant to this immediate issue, any other conclusion by the commission would have lacked testimonial support. Restated, because MCF has the burden of proof, the *absence* of affirmative evidence to support its position is in itself supportive of the EIC decision. *See* Wright v. Peabody Coal Co., 225 Ind. 679, 77 N.E.2d 116 (1948).

VI–C

We conclude our discussion of the factual basis of the decision appealed from by

an analysis of the finding that MCF had failed to sustain its burden by proving its capacity to comply with Section 484(3).[18]

We assume that the EIC deemed that an oil spill not only was a threat to the "existing natural environment" but also as having an adverse effect on the "existing uses" and "natural resources" of Searsport and other adjoining municipalities.

The EIC found as a fact that:

"23. Oil spills would occur as a result of the operation of this development.

24. A substantial oil spill in the waters adjacent to Sears Island would adversely affect the water quality to the detriment of existing uses in Searsport and adjoining municipalities."

Additionally, findings 25 to 31 dealt with the impact of oil spills on the general area, including the problems of containment and "clean up" and the adverse effect on the waters of Penobscot Bay as well as on the marine life therein. The EIC found that the impact of oil spills, even in small quantities, would be "deleterious" and would adversely affect the area. It concluded that MCF had failed to prove its capacity to prevent the probability of these deleterious results from occurring.

Was there "substantial evidence" to support this conclusion?

The record contains evidence from which the EIC could find:

1. The proposed refinery would increase marine traffic in Penobscot Bay by over 200%.

2. Tanker and barge capacity of feedstocks (crude oil) would need to approximate at least 150,000 barrels per day to meet the production requirements of the refinery.

3. Coastal waters in the area are classified SA and SB-1. 38 M.R.S.A. § 364. Waters so classified "shall be suitable for all clean water usages" and "shall contain no . . . oil or sludge deposits attributable to . . . industrial wastes" and shall be free of "substances or wastes . . . injurious to edible fish or shellfish."

4. Technology cannot guarantee against a major oil spill. The mere volume of oil to be transferred into the refinery, combined with a regular discharge of oil from the waste treatment plant, creates a substantial likelihood of spills of a fairly constant nature.

5. The currents and weather hazards of Penobscot Bay make containment of oil spills more difficult than in other more standardized types of water.

6. Clam flats, such as found in Long Cove and Little River Flats in Searsport, when contaminated by oil require long periods for recovery of productivity. Clams actually contaminated by oil become unmerchantable.

7. Lobsters and scallops find the waters and ocean bottom directly off Sears Island as an ideal habitat. Harvesting these products of the sea supports a significant segment of the local economy.

8. Oil is toxic to marine life such as clams, scallops and lobsters.

The extensive record is replete with other definitive testimony bearing on these findings from which the ultimate conclusion of the EIC could find support, but we

18. We give no consideration to the finding that MCF had failed to prove that the proposed development would not adversely affect "property values in the municipality or in adjoining municipalities." While this conclusion is outside the scope of the SLL, it is independent of, and unrelated to, the other findings properly within the statute. In Re Spring Valley Development, Me., 300 A.2d at 751.

see no useful purpose in further itemization.

We answer our opening question affirmatively.

## CONCLUSION

As we have previously stated, 38 M.R.S.A. § 487 limits our review to the record of the hearing and order of the EIC resulting therefrom. We must determine not whether we would have reached the same conclusion as did the commission but whether that conclusion "is supported by substantial evidence." We decide that it was.

The entry is:

The decision of the Environmental Improvement Commission is affirmed.

WEBBER, J., sat at argument but retired before the opinion was rendered.

All Justices concurring.